UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARK JOHNSON,

                    *Petitioner,*

            v.                                              No. 23 Civ. ___

UNITED STATES OF AMERICA,

                    *Respondent.*

## PETITION FOR A WRIT OF ERROR *CORAM NOBIS* AND MEMORANDUM IN SUPPORT

Alexandra A.E. Shapiro
C. Eric Hintz
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
cehintz@shapiroarato.com

*Counsel for Petitioner Mark Johnson*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

    A. Factual Background ................................................................................. 3

    B. Procedural History ................................................................................. 8

        1. *District Court Proceedings* .......................................................... 8

        2. *Second Circuit Appeal* ................................................................ 9

        3. *Petition for Certiorari* ............................................................... 10

        4. *Service of Sentence and Payment of Penalties* ........................... 11

    C. *Ciminelli v. United States* ..................................................................... 11

ARGUMENT ....................................................................................................... 12

    I.   MR. JOHNSON'S CONVICTION MUST BE SET ASIDE TO
ACHIEVE JUSTICE ...................................................................................... 12

        A. Under *Ciminelli*, The "Right To Control" Is Not A Legally Valid Basis
For A Wire Fraud Conviction ................................................................... 13

        B. *Ciminelli* Eradicates The Second Circuit's Sole Basis For Upholding Mr.
Johnson's Wire Fraud Conviction, Leaving Him With A Felony Conviction
For Conduct That Is Not Criminal ............................................................ 15

        C. In These Circumstances, The First *Coram Nobis* Factor Is Satisfied ................. 18

    II.  MR. JOHNSON COULD NOT HAVE SOUGHT RELIEF PRIOR TO
THE SUPREME COURT'S RECENT DECISION IN *CIMINELLI* .......................... 23

    III. MR. JOHNSON'S CONVICTION CONTINUES TO CAUSE HIM
CONCRETE HARM ....................................................................................... 24

    IV. THE MONIES MR. JOHNSON PAID TO SATISFY THE FINE AND
SPECIAL ASSESSMENT SHOULD BE RETURNED TO HIM ................................ 25

    V.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO
RETRY MR. JOHNSON .................................................................................. 26

        A. The Misappropriation Theory Was Legally Invalid ................................. 26

        B. The Equities Weigh Against Permitting Any Retrial .............................. 31

CONCLUSION ..................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Allen v. Credit Suisse Sec. (USA) LLC*,
    895 F.3d 214 (2d Cir. 2018) ................................................................................. 30

*Allen v. United States*,
    867 F.2d 969 (6th Cir. 1989) ................................................................................. 19

*Aon Fin. Prods., Inc. v. Societe Generale*,
    476 F.3d 90 (2d Cir. 2007) ..................................................................................... 5

*Carpenter v. United States*,
    484 U.S. 19 (1987) ................................................................................................ 14

*Children's Broad. Corp. v. Walt Disney Co.*,
    245 F.3d 1008 (8th Cir. 2001) ............................................................................... 29

*Chima v. United States*,
    No. 3:17-CV-2987-D-BT, 2019 WL 2304072 (N.D. Tex. Apr. 15, 2019) ............... 24

*Ciminelli v. United States*,
    143 S. Ct. 1121 (2023) .................................................................................. passim

*Cleveland v. United States*,
    531 U.S. 12 (2000) ................................................................................................ 13

*Cooper v. Parsky*,
    140 F.3d 433 (2d Cir. 1998) ................................................................................. 29

*de Kwiatkowski v. Bear, Stearns & Co.*,
    306 F.3d 1293 (2d Cir. 2002) ............................................................................... 28

*Doe v. United States*,
    915 F.3d 905 (2d Cir. 2019) ................................................................................. 12

*Dunn v. United States*,
    No. 2:02–cr–0468–MCE–CMK, 2012 WL 1455238 (E.D. Cal. Apr. 26, 2012) ..... 25

*Edwards v. United States*,
    564 F.2d 652 (2d Cir. 1977) ................................................................................. 19

*Fleming v. United States*,
    146 F.3d 88 (2d Cir. 1998) ................................................................................... 24

*Foont v. United States*,
93 F.3d 76 (2d Cir. 1996) ............................................................................ 2, 12

*Howard v. United States*,
962 F.2d 651 (7th Cir. 1992) ............................................................................ 24

*Hughes v. United States*,
138 S. Ct. 1765 (2018) ...................................................................................... 33

*In re Mid-Island Hosp., Inc.*,
276 F.3d 123 (2d Cir. 2002) .............................................................................. 30

*Jacked Up, L.L.C. v. Sara Lee Corp.*,
854 F.3d 797 (5th Cir. 2017) ............................................................................ 29

*James v. United States*,
No. 16-22029-CIV-WILLIAMS, 2017 WL 11319189 (S.D. Fla. Feb. 13, 2017) ................... 25

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009) ........................................................... 28, 30

*Kovacs v. United States*,
744 F.3d 44 (2d Cir. 2014) .................................................................... 12, 23, 25

*Ku v. Att'y Gen.*,
912 F.3d 133 (2d Cir. 2019) .............................................................................. 25

*Martingnoni v. United States*,
Nos. 92 Cr. 1097 (JFK), 10 Civ. 6671 (JFK),
2011 WL 4834217 (S.D.N.Y. Oct. 12, 2011) ................................................ 19, 21

*McDonnell v. United States*,
579 U.S. 550 (2016) .......................................................................................... 19

*McNally v. United States*,
483 U.S. 350 (1987) .................................................................................... 13, 14

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996) .............................................................................. 29

*Parietti v. United States*,
No. 16 Cr. 373 (PAE), 2022 WL 3139623 (S.D.N.Y. Aug. 5, 2022) ................... 24, 25

*Percoco v. United States*,
143 S. Ct. 1130 (2023) ...................................................................................... 27

iii

*Telink, Inc. v. United States*,
   24 F.3d 42 (9th Cir. 1994) ................................................................. 25

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) ............................................. 14, 17, 18, 23

*United States v. Bruno*,
   903 F.2d 393 (5th Cir. 1990) ................................................. 18, 19, 20

*United States v. Chestman*,
   947 F.2d 551 (2d Cir. 1991) ........................................................ 27, 28

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017) ................................................................. 23

*United States v. Hirsch*,
   239 F.3d 221 (2d Cir. 2001) ............................................................... 30

*United States v. Holt*,
   No. 2:05-CR-20012, 2017 WL 1181509 (W.D. La. Mar. 28, 2017) ........ 24

*United States v. Johnson*,
   945 F.3d 606 (2d Cir. 2019) ...................................................... passim

*United States v. Lebedev*,
   932 F.3d 40 (2d Cir. 2019) ................................................................. 13

*United States v. Lesane*,
   40 F.4th 191 (4th Cir. 2022) .............................................................. 18

*United States v. Libous*,
   858 F.3d 64 (2d Cir. 2017) ................................................................. 26

*United States v. Mandel*,
   862 F.2d 1067 (4th Cir. 1988) ................................................. 19, 20, 25

*United States v. Marcello*,
   876 F.2d 1147 (5th Cir. 1989) ...................................................... 19, 24

*United States v. Morgan*,
   346 U.S. 502 (1954) ..................................................................... 2, 12

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................... 26, 27, 31

iv

*United States v. Panarella*,
   No. 00–655, 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011) ........................................ 24

*United States v. Peter*,
   310 F.3d 709 (11th Cir. 2002) ........................................................................ 19, 23

*United States v. Shamy*,
   886 F.2d 743 (4th Cir. 1989) ................................................................................ 21

*United States v. Skelly*,
   442 F.3d 94 (2d Cir. 2006) .................................................................................... 27

*United States v. Solano*,
   966 F.3d 184 (2d Cir. 2020) .................................................................................. 10

*United States v. Szur*,
   289 F.3d 200 (2d Cir. 2002) .................................................................................. 20

*United States v. Tapia*,
   816 F. App'x 619 (2d Cir. Aug. 24, 2020) ............................................................ 10

*United States v. Travers*,
   514 F.2d 1171 (2d Cir. 1974) ................................................................... 19, 20, 24

*United States v. Walgren*,
   885 F.2d 1417 (9th Cir. 1989) .............................................................................. 19

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*,
   661 F.3d 164 (2d Cir. 2011) .................................................................................. 29

*Walton v. Morgan Stanley & Co.*,
   623 F.2d 796 (2d Cir. 1980) .................................................................................. 28

*Woodward v. United States*,
   905 F.3d 40 (1st Cir. 2018) ................................................................................... 23

*Yates v. United States*,
   354 U.S. 298 (1957) ............................................................................................... 20

## Statutes

18 U.S.C. § 1343 ..................................................................................................... 3, 9

18 U.S.C. § 1349 ........................................................................................................ 3

8 U.S.C. § 1182 .................................................................................................................... 25

28 U.S.C. § 1651 .................................................................................................................. 12

**Other Sources**

11 Williston on Contracts § 30:25 (4th ed. 2023) ........................................................ 29

Selwyn Raab, *Donovan Cleared of Fraud Charges by Jury in Bronx*,
    N.Y. Times, May 26, 1987 ........................................................................................ 32

Petitioner Mark Johnson, through his undersigned attorneys, submits this petition for a writ of error *coram nobis* to vacate the conviction and sentence entered on May 10, 2018, in the U.S. District Court for the Eastern District of New York, by the Honorable Nicholas G. Garaufis in the matter captioned *United States v. Johnson et al.*, No. 16 Cr. 457 (NGG).

## INTRODUCTION

Mark Johnson, a citizen and resident of the United Kingdom, is a 57-year-old father of six with no criminal record other than the judgment he seeks to have vacated through this petition.  Until his arrest in 2016, Mr. Johnson was gainfully employed for over 25 years in the foreign exchange industry.  During his long and successful career, he worked at several large international banks, as well as his own foreign exchange advisory firm, and held positions of significant responsibility.  Most recently, he served as global head of HSBC's foreign exchange business.  Until 2016, Mr. Johnson's long and unblemished career was unmarred by any customer complaint or civil, regulatory, or criminal investigation or charge.

In 2016, Mr. Johnson was arrested at JFK airport on his way to London.  The arrest was based on fraud charges in connection with a large foreign exchange transaction between HSBC and Cairn Energy, a multibillion-dollar Scottish public company.  The government brought these charges even though Cairn, the purported victim, had never complained to the authorities anywhere in the world about HSBC's (or Mr. Johnson's) conduct of the transaction.

Throughout the criminal proceedings, Mr. Johnson maintained his innocence.  He testified on his own behalf and pursued a direct appeal and a petition for certiorari.  At every stage, he argued that, even accepting the government's view of the facts, his conduct was consistent with standard industry practice and, as a matter of law, did not constitute criminal fraud.

However, following a jury trial in 2017, Mr. Johnson was convicted of wire fraud and conspiracy to commit wire fraud and sentenced principally to 24 months' imprisonment and a $300,000 fine. The Second Circuit affirmed Mr. Johnson's convictions, based solely upon the Circuit's then-settled "right to control" theory of property fraud. *See United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019). In November 2020, the Supreme Court denied Mr. Johnson's petition for certiorari, which challenged the validity of that theory.

But then on May 11, 2023, just as Mr. Johnson was completing service of his sentence, the Supreme Court unanimously ruled that the Second Circuit's "right to control" theory is legally invalid and cannot support a conviction for wire fraud. *See Ciminelli v. United States*, 143 S. Ct. 1121 (2023). The intervening *Ciminelli* decision thus eviscerated the entire foundation of the ruling affirming Mr. Johnson's conviction—but only once it was too late for him to avoid serving his prison sentence.

In light of *Ciminelli*, Mr. Johnson respectfully requests that the Court issue a writ of error *coram nobis*, vacate his convictions, and order the return of the financial penalties he has paid. He seeks *coram nobis* relief because he has completed his custodial sentence, and habeas corpus relief is therefore unavailable. *See United States v. Morgan*, 346 U.S. 502, 511-13 (1954).

Although *coram nobis* is an exceptional remedy, its three requirements are satisfied here. *See Foont v. United States*, 93 F.3d 76, 78-79 (2d Cir. 1996). First, granting the writ is necessary to achieve justice, because Mr. Johnson's conviction was procured and upheld based upon an invalid wire fraud theory and because, after *Ciminelli*, the government dismissed the charges against Mr. Johnson's only co-defendant. Second, Mr. Johnson had sound reasons for not seeking this relief earlier. He pursued a direct appeal, which was unsuccessful and, until the *Ciminelli* decision, had no legal basis to further challenge his conviction. Third, Mr. Johnson

2

continues to suffer from various legal consequences of his conviction that would be remedied by granting the writ. Among other things, the conviction prevents him from obtaining employment in his field, procuring insurance services, and traveling to many countries, including the United States. Accordingly, the writ should be granted.

## BACKGROUND[1]

### A. Factual Background

On October 23, 2017, following a four-week jury trial in the Eastern District of New York, Mr. Johnson was convicted on one count of conspiracy to commit wire fraud (18 U.S.C. § 1349) and eight counts of wire fraud (18 U.S.C. § 1343). He was convicted based on allegations that he deceived a counterparty in a large foreign currency exchange and that as a result, his employer earned greater profits from the transaction than it otherwise would have earned.

The evidence at trial showed the following facts:

Cairn Energy, a major European oil and gas company, announced in 2010 that it would sell a subsidiary and distribute approximately $4 billion in proceeds to shareholders. *United States v. Johnson*, 945 F.3d 606, 608-09 (2d Cir. 2019). To achieve this, Cairn needed to convert the dollars to British pounds. Cairn retained Rothschild, a leading international investment bank, "to advise it" for this conversion. *Id.*

In October 2011, Cairn considered proposals from nine banks, including HSBC, for the currency exchange. At the time, Mr. Johnson was the London-based leader of HSBC's foreign exchange business. *Id.* at 608-09.

---

[1] The facts set forth in this petition are drawn from the Second Circuit's opinion affirming Mr. Johnson's convictions, the trial record, the declaration of Mark Johnson attached to this petition as Exhibit C ("Johnson Decl."), and the docket entries from Mr. Johnson's criminal case in this Court and the Second Circuit. "Dkt." refers to docket entries in this Court; "CA2 Dkt." refers to docket entries from the Second Circuit appeal; "A-" refers to the Second Circuit appendix (CA2 Dkts.57-59); and "Ex. __" refers to exhibits to this petition.

Cairn assessed various conversion methods and ultimately chose a "fix"—a benchmark exchange rate published hourly. With this method, parties agree to exchange currencies at the "fix" rate set at a specified future time. *Id.* at 609. For instance, parties might agree at 1pm to exchange U.S. dollars into pounds based on the 3pm fix rate for converting dollars into pounds. Banks charge no fee and instead try to make money by "beating the fix." (*E.g.*, A-127-28). In other words, using the same example, the bank hopes to buy pounds at a lower rate than the future fix rate at which it must sell them to the counterparty. In an unusually large transaction such as Cairn's, the bank incurs significant risk, but the pound's price likely rises as the bank buys pounds in significant quantities. If it does, the bank profits by selling the counterparty pounds at the higher price. (A-200-02). Cairn understood HSBC's accumulation of pounds in advance of the transaction would "pressure the fixing" in this way and "expect[ed] [HSBC] would make money" by "beat[ing] the fix." (A-136; A-397).

Cairn had extensive experience with foreign exchange and routinely executed currency transactions without the outside assistance of a bank. (A-111-14). And it was advised by Rothschild, the "Goldman Sachs of Europe." (A-233). On October 13, 2011, Francois Jarrosson, the Rothschild partner advising Cairn on the foreign exchange transaction, called Mr. Johnson. Jarrosson asked how much advance notice HSBC would need for a fix conversion. Mr. Johnson responded that HSBC needed a "minimum of two hours" to avoid undue upward pressure on the fix rate; only "30 minutes" notice would "cause a lot of noise" because HSBC would have "a lot to buy"; and "[t]he more time we have…the more quietly we can just accumulate the position" to provide "a fair price." A-386-87; *Johnson*, 945 F.3d at 609. Jarrosson asked whether HSBC would "share some upside" if it earned substantial profits. A-389; *Johnson*, 945 F.3d at 609. Mr. Johnson refused, stating that if a bank agrees in advance to

4

share profits, "you're doing it cause you're intending to ramp the fix," *i.e.*, pressure the rate

higher.  A-389; *Johnson*, 945 F.3d at 609.  The government called this "a promise" that "HSBC

isn't going to ramp the fix."  (A-250).

On October 20, 2011, Rothschild recommended that Cairn use "a fixing."  *Johnson*, 945

F.3d at 609; A-304.  However, Jarrosson warned Cairn that "Cairn is not in control of timing

during the 2hrs between notice and fixing," "[m]arkets could move against Cairn," and there is

"[r]isk of market disruption owing to a compressed execution window."  (A-307).

Cairn ultimately chose HSBC to execute the transaction.  *Johnson*, 945 F.3d at 610.  Cairn

"wanted to lock in key terms" and insisted on a written agreement memorializing each party's

obligations.  (A-129).  Accordingly, Rothschild drafted that contract (referred to as the "Mandate

Letter"), and Cairn's counsel reviewed and approved it.  (A-130).  The contract committed

HSBC to converting up to $4 billion at Cairn's request, using whichever of three conversion

methods Cairn selected.  (A-309).  If Cairn chose a "fixing," it was obliged to give HSBC two

hours' advance notice.  *Id.*; *Johnson*, 945 F.3d at 610.

The contract also provided that any transaction would be "governed by" the parties'

existing International Swap Dealers Association Master Agreement ("ISDA").  (A-309).  The

ISDA is widely used in FX transactions and "governs the legal and credit relationship between

the parties and other aspects of the agreement."  *Aon Fin. Prods., Inc. v. Societe Generale*, 476

F.3d 90, 93 n.4 (2d Cir. 2007).  The Cairn-HSBC ISDA expressly stated that it "supersede[d] all

oral communication" between the parties "with respect to its subject matter."  (A-362).  Nothing

in the Mandate Letter or ISDA restricted how HSBC would accumulate pounds to fill Cairn's

order.  The contract also established an arm's-length relationship.  Both the ISDA and the

Mandate Letter expressly disclaimed any fiduciary, agency, or advisory relationship.  (A-310

(Mandate Letter) ("document shall not be regarded as creating any form of advisory or other relationship"); A-373 (ISDA) (each party agrees that "[t]he other party is not acting as fiduciary for or as an adviser to it in respect of [any] Transaction" and "is entering into the Agreement, including each Transaction, as principal and not as agent of any person or entity")).

On December 7, 2011, at 1:56pm, Cairn instructed HSBC to exchange approximately $1.15 billion at the 3pm fix rate, providing one hour's notice instead of the mandated two.  (A-326).  At 2:28pm, under 35 minutes before the fix rate would be set, Cairn replaced that order with one to exchange £2.25 billion worth of dollars.  (A-325-26).[2]  By then, HSBC had already purchased a significant number of pounds to carry out the transaction.  (A-401).

Most of HSBC's trades for this transaction were placed by its trader Frank Cahill in London.  Cahill testified that Mr. Johnson "didn't" give him "any direction" about "how to execute."  (A-149-50).  Cahill traded "the same way [he] normally trade[s] fixes," and used various strategies to minimize upward movement of the pound's price, along with some "aggressive" methods.  A-164-67; A-171-73; A-185-86; A-206-07; *Johnson*, 945 F.3d at 610.

At 2:54pm, Mr. Johnson, who was in HSBC's New York office, learned HSBC was still £1.2 billion short of the amount needed to complete the currency exchange.  (A-160-61; A-335).  He then authorized Stuart Scott, his colleague in London who was supervising Cahill's trading, not to "ramp" higher than the price would have been under an alternative conversion method Cairn had rejected.[3]  *Johnson*, 945 F.3d at 610-11.  Mr. Johnson also twice directed Scott to "go

---

[2] It is unclear why, but Cairn's first order was framed in terms of dollars, and its second, replacement order, used pounds to identify the amount.

[3] Scott was named as a co-defendant in the indictment.  However, he successfully fought extradition from the U.K., and never appeared in the case.  On June 21, 2023, while his challenge to the indictment on extraterritoriality and *Ciminelli* grounds was pending, the government moved for dismissal of the charges against Scott.  (Dkt.315).  This Court granted the government's motion on June 27, 2023.  (Dkt.316).

short some"—meaning it was not necessary to purchase *all* the pounds HSBC would sell to Cairn before 3pm—to reduce upward pressure on the pound's price. (A-336). However, Cahill apparently never received these instructions and purchased the remaining pounds in the next six minutes, during which time the pound's price increased significantly. (A-157-58; A-401).

On a 3:14pm call after the transaction, Scott told Cairn that HSBC began "taking action" at 2:55pm. (A-338-39). Cairn knew purchasing £2.25 billion in the five minutes before 3pm would have significantly ramped up the price. Yet Cairn didn't complain or suggest HSBC should have spread its trades out more evenly to try to reduce the fix price. During that call, Scott (allegedly falsely) attributed an unspecified portion of the rate increase to "the Russian Central Bank" "buying" pounds before 3pm. A-339; *see Johnson*, 945 F.3d at 611. Mr. Johnson remarked that central banks are "always selling dollars." A-340; *see Johnson*, 945 F.3d at 611.

Purchasing pounds in advance of the fix, as HSBC did in this transaction, was fully consistent with widely recognized and codified global standards. *See* Br. of ACI-Financial Markets Association as *Amicus Curiae* in Support of Petitioner at 8-10, *Johnson v. United States* (No. 19-1412). No rules dictated how the bank should trade Cairn's order. On the contrary, Congress and the Treasury Department (in consultation with the CFTC) have deliberately refrained from regulating sophisticated counterparty exchanges and chosen not to subject them to Commodities Exchange Act anti-fraud provisions. *See id.* at 16-17; CA2 Dkt.73, at 21-23.

HSBC earned a profit of about $7 million, representing only 0.2% of the value of the $3.5 billion transaction. *Johnson*, 945 F.3d at 611.

**B. Procedural History**

*1. District Court Proceedings*

In August 2016, Mr. Johnson was charged in an indictment with one count of conspiracy to commit wire fraud and ten counts of wire fraud based upon his participation in the Cairn transaction. (Dkt.9).[4]

In the indictment and at trial, the government presented two theories of criminal liability. It argued that the alleged scheme (1) misappropriated Cairn's "confidential information…in breach of a duty of trust and confidence owed to Cairn," and (2) denied Cairn its "right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Johnson*, 945 F.3d at 608; *see* Dkt.9, ¶ 10. As to misappropriation, the government alleged that Mr. Johnson should not have purchased pounds for HSBC on November 30, 2011, December 5, 2011, and December 7, 2011, before Cairn placed its order, because he was aware at the time that Cairn might soon execute the large currency conversion it was planning with HSBC. (*See*, *e.g.*, Dkt.9, ¶¶ 20-24, 27). As to "right to control," the government alleged that Mr. Johnson's statements to Jarrosson on the October 13, 2011 call amounted to a false promise not to "ramp" the price of the pound while executing a fix transaction, which impacted Cairn's decisions about its assets. (Ex. B, at 2427-29).

The jury was instructed that the government could satisfy its burden of proving that the alleged scheme "target[ed] money or property" based on either of the two theories: (1) "the defendant misappropriated Cairn's confidential business information in a breach of duty of trust and confidence owed by the defendant to Cairn"; or (2) "the defendant deprived Cairn of its intangible right to control its assets by depriving Cairn through misrepresentations and

---

[4] The government elected not to proceed with Count Seven before trial. (Dkt.128).

omissions, of potentially valuable economic information that would reasonably be expected to affect Cairn's economic decisions."  (Ex. A, at 2712-13).

Mr. Johnson moved for acquittal after the government rested, arguing that the evidence was insufficient under either theory.  (A-192-95).  He testified on his own behalf and renewed his motion for acquittal after the defense rested.  (A-240).  The District Court denied both motions. (A-196; A-240).

On October 23, 2017, Mr. Johnson was convicted of conspiracy and all but one wire fraud count.  (A-260-62).  The jury rendered a general verdict without specifying which fraud theory it had relied upon.  A-448-50; *Johnson*, 945 F.3d at 612.

On April 26, 2018, Mr. Johnson was sentenced to 24 months' imprisonment, to be followed by three years' supervised release.  (Dkt. 239, at 2-3).  The Court imposed a fine of $300,000 and a special assessment of $900, and remanded Mr. Johnson at sentencing.  (*Id.* at 7; A-569-70).

On May 24, 2018, Mr. Johnson filed a motion for bail pending appeal in the Second Circuit.  (CA2 Dkt.14-2).  In the motion, he explained that his appeal would challenge the validity of both the misappropriation and right-to-control theories, and that each claim presented a "substantial question" under 18 U.S.C. § 1343.

On June 19, 2018, the Second Circuit granted bail pending appeal.  (CA2 Dkt.47).  Mr. Johnson was released on June 26, 2018.

    *2.  Second Circuit Appeal*

On appeal, Mr. Johnson argued that he was entitled to a judgment of acquittal because neither of the government's two theories was valid as applied to his case.  He argued that the misappropriation theory was barred as a matter of law and that the government's "right to control" theory failed under Second Circuit case law.  (CA2 Dkt.60, at 26-46; CA2 Dkt.96, at 3-24).  In addition, he maintained that the Second Circuit's right-to-control doctrine was not a

viable theory of wire fraud under Supreme Court precedent and highlighted that two other Circuits had rejected it.  (CA2 Dkt.60, at 46-49; CA2 Dkt.96, at 25).

The government relied principally on its right-to-control theory to defend the conviction. (*See* CA2 Dkt.87, Argument Point I).

The Second Circuit affirmed Mr. Johnson's conviction based solely on the "right to control" wire-fraud theory.  The court expressly declined to "reach Johnson's arguments as to the misappropriation theory."  *Johnson*, 945 F.3d at 608.  It said:  "[W]e conclude that the evidence was sufficient to convict Johnson of wire fraud and conspiracy to commit wire fraud for depriving Cairn of the 'right to control' its assets.  Accordingly, we need not and do not consider Johnson's arguments with respect to the misappropriation theory."  *Id.* at 612.

Mr. Johnson moved for a stay of the mandate, in which he raised the circuit split on "right to control" as a "substantial question" to be raised in his petition for certiorari.  The Second Circuit granted his motion and stayed the mandate pending the filing and disposition of the petition for certiorari.[5]

### 3.   Petition for Certiorari

On June 19, 2020, Mr. Johnson filed a petition for certiorari, in which he argued, *inter alia*, that the Supreme Court should grant review to invalidate the Second Circuit's "right to control" doctrine.  *See* Petition for Certiorari, Point II, *Johnson v. United States* (No. 19-1412).

---

[5] Mr. Johnson subsequently sought late panel rehearing based upon an intervening decision, *United States v. Solano*, 966 F.3d 184 (2d Cir. 2020).  *Solano* held that an instruction about defendant's testimony nearly identical to the one at Mr. Johnson's trial violated the presumption of innocence because it implied that the defendant's "interest in the outcome" created a "motive to testify falsely."  966 F.3d at 197-98.  In fact, of course, an innocent defendant has no motive to testify falsely; only a guilty defendant has a motive to lie.  Mr. Johnson argued that *Solano* established that the jury instruction in his case, to which he had objected, rendered his trial fundamentally unfair and presented good cause for late relief.  His motion and a subsequent motion for panel or en banc reconsideration were denied (CA2 Dkts.165, 174, 176)— even though at around the same time the Second Circuit granted late, post-mandate relief based on *Solano* to a similarly situated defendant, *see United States v. Tapia*, 816 F. App'x 619 (2d Cir. Aug. 24, 2020).

The Supreme Court denied certiorari on November 2, 2020.

*4.  Service of Sentence and Payment of Penalties*

On July 15, 2021, Mr. Johnson surrendered to the Bureau of Prisons to resume service of his sentence.

On July 30, 2021, at Mr. Johnson's request, the District Court exonerated his bail and directed that monies previously posted to secure bail be used to satisfy his fine and special assessment.  (Dkt.302)  Accordingly, on August 24, 2021, the government filed an order confirming that the fine and special assessment had been fully paid and that the judgment as to those financial penalties was fully satisfied.  (Dkt.305).

On March 2, 2022, the Bureau of Prisons transferred Mr. Johnson to the custody of Her Majesty's Prison and Probation Services in the United Kingdom for completion of his sentence pursuant to a treaty transfer.  (Johnson Decl., ¶ 3).

On May 14, 2023, Mr. Johnson completed service of his sentence.  (*Id.* ¶ 4).

**C.  *Ciminelli v. United States***

On May 11, 2023, the Supreme Court issued its *Ciminelli* decision.  In *Ciminelli*, which is discussed in further detail below, the Court unanimously held that "[b]ecause 'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest…the right-to-control theory is not a valid basis for liability under § 1343."  *Ciminelli v. United States*, 143 S. Ct. 1121, 1124 (2023); *see also id.* at 1128 ("[T]he right-to-control theory cannot form the basis for a conviction under the federal fraud statutes."); *id.* at 1129 ("The right-to-control theory is invalid under the federal fraud statutes.").  The Court explained that the wire fraud statute is limited to the protection of property rights, and that the "so-called 'right to control' is not an interest that had 'long been recognized as property' when

the wire fraud statute was enacted." *Id.* at 1127.  Accordingly, the Court reversed the Second

Circuit's decision affirming a conviction under the right-to-control theory.  *Id.* at 1124.

## ARGUMENT

A *coram nobis* petition is a collateral proceeding to correct fundamental errors in a prior

judgment when the petitioner is not in custody and thus cannot pursue habeas relief.  *See Doe v.*

*United States*, 915 F.3d 905, 909 (2d Cir. 2019).  A petition for a writ of error *coram*

*nobis* will lie under the All Writs Act statute, 28 U.S.C. § 1651, with respect to a federal felony

conviction when, as here, the sentence has been fully served.  *United States v. Morgan*, 346 U.S.

502, 505 & n.6 (1954).  The Supreme Court recognizes that the writ is necessary because "the

results of the conviction may persist" even when a sentence has been completed.  *Id.* at 512-13.

To obtain relief, the petitioner "must demonstrate that 1) there are circumstances

compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate

earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that

may be remedied by granting of the writ." *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir.

2014) (quoting *Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996)).

All three elements are met here.  Accordingly, Mr. Johnson is entitled to vacatur of his

conviction, as well as the return of the financial penalties he has paid.  Moreover, the government

should not be permitted to retry him, because his conduct was not criminal and there is no legally

valid alternative theory of wire fraud.

## I.    MR. JOHNSON'S CONVICTION MUST BE SET ASIDE TO ACHIEVE JUSTICE

The first factor—whether granting the writ is necessary to achieve justice—is met

because the jury was permitted to convict Mr. Johnson based upon a wire fraud theory that has

been invalidated by an intervening legal change.  Here, the jury was permitted to convict Mr.

Johnson based upon the "right to control" theory, and his conviction was affirmed based solely

on that theory, which has now been invalidated by the Supreme Court.  In addition, it would be fundamentally unfair to deny relief to Mr. Johnson, particularly because he was deprived of his liberty for many months, when his co-defendant's case was dismissed after *Ciminelli*.

### A.    Under *Ciminelli*, The "Right To Control" Is Not A Legally Valid Basis For A Wire Fraud Conviction

Ciminelli was a real estate developer who obtained millions of dollars through contracts to build certain projects in Buffalo, New York, that were funded by a New York State economic development program.  The government's theory at his trial was that he and his co-defendants had engaged in a bid-rigging scheme that deprived their counterparty to the contract "of potentially valuable economic information that it would consider valuable in deciding how to use its assets."  *Ciminelli*, 143 S. Ct. at 1125-26.

The Supreme Court granted certiorari to determine "whether the Second Circuit's right-to-control theory of wire fraud is a valid basis for liability under 18 U.S.C. § 1343."  *Id.* at 1126.  The Court held that "it is not."  *Id.*  The Court explained that proof of a defendant's deception, without more, is insufficient to establish a fraud scheme.  That is because the fraud statutes only cover "wronging one in his property rights."  *Id.* (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)).

The right-to-control theory emerged in the early 1990s, after the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987).  The theory posited that "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets" and that a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions."  *Ciminelli*, 143 S. Ct. at 1127 (quoting *United States v.*

13

*Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019), and *United States v. Binday*, 804 F.3d 558, 570 (2d Cir.

2015)).

In *Ciminelli*, however, the Supreme Court ruled that the Second Circuit's theory "cannot

be squared with the text of the federal fraud statutes" or their "structure and history."  143 S. Ct.

at 1127-28.  The Court explained that the fraud statutes are textually "limited in scope to the

protection of property rights," and that the "so-called 'right to control' is not an interest that had

'long been recognized as property' when the wire fraud statute was enacted."  *Id.* at 1127

(quoting *McNally*, 483 U.S. at 360, and *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).  As

to structure and history, the Court pointed out that after "*McNally* put an end to federal courts'

use of mail and wire fraud to protect an ever-growing swath of intangible interests unconnected

to property," Congress responded in a limited way, by enacting a statute that revived "*only* the

intangible right of honest services" and not any other intangible rights recognized by lower

courts pre-*McNally*.  143 S. Ct. at 1128.

The Court also reasoned that "the right-to-control theory vastly expands federal

jurisdiction without statutory authorization."  *Id.*  The Court observed that, "[b]ecause the theory

treats mere information as the protected interest, almost any deceptive act could be criminal."  *Id.*

Accordingly, the Court explained, the theory "makes a federal crime of an almost limitless

variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction

with [the Court's] caution that, 'absent a clear statement by Congress,' courts should 'not read

the mail and wire fraud statutes to place under federal superintendence a vast array of conduct

traditionally policed by the States.'"  *Id.* (cleaned up).

In sum, the Court held:  "[T]he wire fraud statute reaches only traditional property

interests.  The right to valuable economic information needed to make discretionary economic

decisions is not a traditional property interest.  Accordingly, the right-to-control theory cannot

form the basis for a conviction under the federal fraud statutes."  *Id.*

> **B.**      ***Ciminelli* Eradicates The Second Circuit's Sole Basis For Upholding Mr. Johnson's Wire Fraud Conviction, Leaving Him With A Felony Conviction For Conduct That Is Not Criminal**

The jury at Mr. Johnson's trial was instructed that it could convict him of wire fraud and

wire fraud conspiracy based on the right-to-control theory.  The language of the instructions

tracked the Second Circuit doctrine invalidated in *Ciminelli*.  The instructions emphasized the

same concepts the Supreme Court found insufficient to establish wire fraud in *Ciminelli*:  the

idea that the right to control one's assets is itself a property interest protected by the statute, and

the idea that the deprivation of "potentially valuable economic information" is a harm cognizable

under the statute.  For instance, the jury instructions said:  "Under the 'right to control' theory,

the government contends that the defendant has committed wire fraud by making material

misrepresentations and omissions that deceived Cairn and *deprived it of potentially valuable*

*economic information that Cairn…would consider valuable in deciding how to use its assets*."

(Ex. A, at 2716) (emphasis added).  And the instructions told the jury that, "[u]nder the 'right to

control' theory, the property at issue is the *alleged victim's right to control its assets*, which can

be harmed when the alleged victim is deprived of potentially economically valuable information

that would be valuable in deciding how to use those assets."  (*Id*.) (emphasis added).

The government repeatedly relied upon those now erroneous instructions and the invalid

"right to control" doctrine in its arguments to the jury.  For example, it urged the jury to convict

Mr. Johnson because:

- "[T]here's a second type of thing that's a property right.  And that is a victim's

  intangible right to control his or her own property."  (Ex. B, at 2427).

15

- "Under the right to control theory…the property at issue is the alleged victim's right to control its assets, which can be harmed when the alleged victim is deprived of the potentially valuable economic information." (*Id.* at 2427-28).

- "[I]n addition to hiding the important information from the client, we see that Mr. Johnson said things, he made affirmative lies that also cheated the client out of its right to control its property, meaning, the right to control its money and how it is exchanged." (*Id.* at 2428-29).

- Mr. Johnson's purported promise on his October 13 call not to "ramp" was "the affirmative lie that deprived that victim of its right to control how it uses its money." (*Id.* at 2429).

The government also stressed that the jury could rely solely on "right to control" and did not need to find that it had proven both of its wire fraud theories. (*See id.* at 2428).

And the Second Circuit affirmed Mr. Johnson's conviction based *solely* on the "right to control." On appeal, Mr. Johnson argued that the evidence at trial, viewed in the light most favorable to the government, did not establish that his conduct violated the wire fraud statute under either of the government's theories. And he argued that both theories were invalid as a matter of law. But the Circuit refused to resolve Mr. Johnson's challenge to the misappropriation theory, saying, "we need not and do not consider Johnson's arguments with respect to the misappropriation theory" because the court found the evidence under "right to control" sufficient. *Johnson*, 945 F.3d at 612. The court stated that "when two theories of an offense are submitted to the jury and the evidence supports one theory but not the other, the verdict should be affirmed." *Id.* at 612 (cleaned up). Accordingly, it held that "the evidence was sufficient to

16

convict Johnson of wire fraud and conspiracy to commit wire fraud for depriving Cairn of the 'right to control' its assets" and affirmed on that basis alone. *Id.*

In doing so, the court squarely relied on the very doctrine the Supreme Court invalidated in *Ciminelli*. *See id.* at 612-14 (citing *Binday* and other Second Circuit right-to-control cases that do not survive *Ciminelli*). The Second Circuit relied on the alleged promise not to "ramp" during Mr. Johnson's telephone call with Jarrosson—the same alleged promise the government told the jury proved its right-to-control theory at trial. *Id.* at 613-14. And the court held that fraudulent intent could be found "because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain," *id.* at 613—in other words, the exact information-deprivation theory the Supreme Court subsequently rejected in *Ciminelli*.

The Second Circuit's reasoning not only conflicts with the Supreme Court's holding in *Ciminelli*, but also its reasoning. The Supreme Court expressed concern that the right-to-control doctrine "expands federal jurisdiction without statutory authorization" and "makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Ciminelli*, 143 S. Ct. at 1128. Here, two sophisticated companies chose to engage in a complex, enormous foreign exchange transaction, knowing that in conducting the transaction HSBC would incur significant risk and could only make money by "beating the fix." They entered a written contract, drafted by Cairn's adviser and reviewed by its counsel, which contained an integration clause and did not require HSBC to execute the transaction in any particular way. Yet the Court of Appeals concluded, as the government had argued to the jury, that Mr. Johnson "deceived Cairn with respect to both how the FX Transaction would be conducted and the price of the FX Transaction" during his October 13 call with Jarrosson. *Johnson*, 945 F.3d at 613-14. (This was the supposedly "potentially valuable economic

17

information" impacting Cairn's right to control its assets.)   In doing so, the court was inserting terms nowhere to be found in these sophisticated parties' contract.  It was rewriting a contract that expressly superseded any prior oral statements and pointedly did *not* specify "how the FX Transaction would be conducted" or "the price" (which could not be predicted in advance with a fix, absent a crystal ball).  But the Second Circuit said it didn't matter whether "the parties' contract was never breached" and that even if the victim "received the benefit of its bargain under the terms of the parties' contract," a court could nevertheless find that deceit "implicated an essential element of the bargain."  *Id.* at 613 (citing *Binday*, 804 F.3d at 565-67, 575-76).  In other words, the Second Circuit's application of the wire fraud statute to Mr. Johnson's case highlights the very problem the Supreme Court's decision seeks to avoid—sweeping in conduct "traditionally left to state contract and tort law."  *Ciminelli*, 143 S. Ct. at 1128.

### C.    In These Circumstances, The First *Coram Nobis* Factor Is Satisfied

1.    This case is a paradigmatic example of the type of situation in which *coram nobis* relief is necessary to achieve justice.  Mr. Johnson's conviction was affirmed based entirely upon the Second Circuit's mistaken view that his conduct amounted to criminal wire fraud because it deprived Cairn of its "right to control" its assets.  But the Supreme Court's intervening decision in *Ciminelli* establishes that such conduct does *not* violate the wire fraud statute.  That is precisely the scenario in which justice requires granting a *coram nobis* petition.

For instance, courts have found that justice requires *coram nobis* relief where a subsequent decision shows that jury instructions at the petitioner's trial permitted conviction based upon an invalid legal theory, or for conduct not prohibited by the statute he was charged with violating.  *See*, *e.g.*, *United States v. Lesane*, 40 F.4th 191, 194, 198-201, 205 (4th Cir. 2022) (reversing denial of *coram nobis* where theory of conviction was subsequently invalidated); *United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990) ("[A] conviction [under a wire fraud

18

theory invalidated by *McNally*] would constitute a 'complete miscarriage of justice' such as is required for coram nobis relief."); *United States v. Marcello*, 876 F.2d 1147, 1154 (5th Cir. 1989) (conviction "for conduct which is not a federal offense" is an "error of 'the most fundamental character'"); *United States v. Mandel*, 862 F.2d 1067, 1071-75 (4th Cir. 1988) (fraud conviction vacated after *McNally* based on erroneous instruction); *Edwards v. United States*, 564 F.2d 652, 654 (2d Cir. 1977) ("[W]e have granted relief…in coram nobis where, for example, subsequent decisions have made it clear that the petitioner committed no federal offense."); *United States v. Travers*, 514 F.2d 1171, 1176 (2d Cir. 1974) (Friendly, J.) (*coram nobis* warranted based on intervening change in law because petitioner was "convicted and punished for an act that the law does not make criminal" under mail fraud statute) (cleaned up).

Indeed, many decisions granting relief or finding the first *coram nobis* prong satisfied involve—as here—intervening Supreme Court decisions limiting the scope of federal fraud.  *See*, *e.g.*, *United States v. Peter*, 310 F.3d 709, 711, 715 (11th Cir. 2002) (per curiam); *Bruno*, 903 F.2d at 396; *Marcello*, 876 F.2d at 1154; *United States v. Walgren*, 885 F.2d 1417, 1422-24 (9th Cir. 1989); *Allen v. United States*, 867 F.2d 969, 970-72 (6th Cir. 1989), *Mandel*, 862 F.2d at 1071-75; *Travers*, 514 F.2d at 1172-79; *Martingnoni v. United States*, Nos. 92 Cr. 1097 (JFK), 10 Civ. 6671 (JFK), 2011 WL 4834217, at *9-10 (S.D.N.Y. Oct. 12, 2011).  Justice requires *coram nobis* relief here as well.

2.     The government's alternative theory of property fraud at trial (misappropriation) provides no reason to deny relief.  First, *coram nobis* relief is still necessary regardless of how or whether this Court evaluates the misappropriation theory.  It is indisputable that Mr. Johnson would have been entitled to *at least* a new trial had *Ciminelli* been decided before his direct appeal.  *See*, *e.g.*, *McDonnell v. United States*, 579 U.S. 550, 578-80 (2016) (where it is

"possible" the jury convicted defendant based upon an incorrect instruction and thus "may have convicted [the defendant] for conduct that is not unlawful," instructional error cannot be deemed harmless beyond a reasonable doubt); *Yates v. United States*, 354 U.S. 298, 312 (1957) (holding that where it is "impossible to tell" which of two theories a jury selected, its verdict must be set aside "where the verdict is supportable on one ground, but not on another"); *United States v. Szur*, 289 F.3d 200, 208 (2d Cir. 2002) ("Where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory formed the basis for conviction.").

Thus, courts grant *coram nobis* relief where an intervening decision invalidates a jury instruction, regardless of whether some other theory might have supported a conviction. For instance, in *Mandel*, the court granted *coram nobis* relief because the petitioner's jury was permitted to convict under an honest services fraud theory subsequently rejected in *McNally*. In so doing, the court expressly rejected the government's argument "that granting a writ of error *coram nobis* is improper where the change in the law did not vitiate the criminality of the petitioners' conduct but only brings into question the propriety of the jury instructions." *Mandel*, 862 F.2d at 1075. And it explicitly affirmed that "in a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment." *Id.* at 1073.

Likewise, in *Travers*, the court granted *coram nobis* because of an intervening change in mail fraud law (affecting only the mailing element), even though the defendant's conduct was not innocent. Indeed, Judge Friendly stated that "Travers, to be sure, engaged in criminal conduct, but not in the crime for which he was convicted." *Travers*, 514 F.2d at 1172, 1179. That was enough to warrant the extraordinary remedy of *coram nobis*. *See also Bruno*, 903 F.2d at 396

20

("Because the intangible rights theory of wire fraud, which, under *McNally*, is not a criminal violation, may have infected the jury's decision to convict on the conspiracy charge, it is possible that the jury convicted for conspiracy to commit a noncriminal act. Such a conviction would constitute a 'complete miscarriage of justice' such as is required for coram nobis relief."); *United States v. Shamy*, 886 F.2d 743, 744-45 (4th Cir. 1989) (per curiam) (granting *coram nobis* relief where jury was instructed on valid and invalid theories of fraud); *Martingnoni*, 2011 WL 4834217, at *5, 9-10 (similar).

Second, as explained *infra* in Point V, the misappropriation theory is itself invalid as a matter of law, just like "right to control." Thus, it provides no basis for upholding Mr. Johnson's conviction, nor should the government be permitted to retry him on that theory. On the contrary, Mr. Johnson's conduct simply was not criminal. Indeed, to deny any *coram nobis* relief here would be a particularly egregious miscarriage of justice, because the Second Circuit refused to review Mr. Johnson's legal challenge to misappropriation based on its mistaken view that his conviction could be affirmed under the right-to-control doctrine. Now that that theory has been invalidated and the basis for affirming Mr. Johnson's guilt erased, it would be unconscionable to deny relief based on a different theory that he was deprived of any meaningful opportunity to legally challenge on appeal.

3.    Relief is necessary to achieve justice for an additional reason: Others at HSBC who participated in executing the Cairn transaction either were never prosecuted, or had the charges dismissed. For example, in this very case, the District Court granted a motion the government filed shortly after *Ciminelli* to dismiss the charges against Mr. Johnson's co-defendant, Stuart Scott. (Dkt.316). As discussed above, Mr. Scott directed much of the trading that HSBC carried out in order to execute the Cairn transaction, and allegedly lied to Cairn's

representatives after the transaction was completed about why the price of the pound spiked shortly before the fix time.  In other words, he was fully involved with the transaction and engaged in conduct the government alleged was deceitful, yet ultimately did not have to face prosecution even though the government charged him as a co-conspirator and named him in all the counts.

In its motion to dismiss the charges against Scott, the government focused principally on the fact that Scott, a U.K. citizen who avoided extradition in July 2018, was unlikely ever to appear to face the charges.  (*See* Dkt.315).  However, the government also acknowledged the invalidity of the right-to-control theory in its motion (*see id.* at 3 n.1), and the timing of its motion strongly suggests that *Ciminelli* was the driving factor in the government's decision finally to abandon the long-pending charges against Scott.  That is, in April 2022, Scott had moved to dismiss the charges against him on extraterritoriality grounds and because he was in London during the alleged offenses.  (Dkts.307, 307-1).  In May 2022, the government *opposed* that motion (Dkt.310), which remained pending a year later, when *Ciminelli* was decided.  And the government gave no hint of any change in position until shortly after *Ciminelli* was decided, even though Scott was no more likely to appear in the Eastern District in April 2022 than he was a year later, after the government's change of heart.

What appears to have prompted that change in position was that Scott raised *Ciminelli* as an additional ground in support of his motion to dismiss the indictment on May 31, 2023.  (*See* Dkt.313).  Just a few weeks later, after obtaining an extension of time to respond to the *Ciminelli* argument, the government acquiesced in dismissal.  (Dkt.315).  The result is that Mr. Johnson remains the only person who will ever be deprived of his liberty for HSBC's conduct of this transaction, based on a theory that cannot support a criminal conviction.

Equal justice under law is one of the most fundamental principles underlying our criminal justice system.  Mr. Johnson has already been punished for conduct for which other similarly situated individuals have not faced consequences.  He can never get back the time he already served behind bars.  But at the very least, his conviction should be expunged so he does not have to suffer continuing harmful consequences from being branded a felon based on conduct that is not criminal.

## II.    MR. JOHNSON COULD NOT HAVE SOUGHT RELIEF PRIOR TO THE SUPREME COURT'S RECENT DECISION IN *CIMINELLI*

The second *coram nobis* factor is met because there are "sound reasons" why Mr. Johnson did not previously seek relief.  *Kovacs*, 744 F.3d at 49.  Prior to the Supreme Court's decision in *Ciminelli* on May 11, 2023, Mr. Johnson had no basis to seek collateral relief from his conviction.  The right-to-control doctrine was long settled law in the Second Circuit at the time of his direct appeal.  *See*, *e.g.*, *United States v. Finazzo*, 850 F.3d 94, 108-13 (2d Cir. 2017); *Binday*, 804 F.3d at 570.  Nevertheless, he did preserve his challenge to the doctrine at that time, and raised it in a petition for certiorari, as discussed above.  And between the time his conviction became final when the Supreme Court denied certiorari in his case and its decision in *Ciminelli*, Mr. Johnson lacked any viable claim that his conviction should be set aside and had no reason to pursue collateral relief.  Once the *Ciminelli* decision was issued, however, Mr. Johnson acted diligently, and his counsel began preparing a *coram nobis* petition on his behalf.  That easily satisfies the second factor.  *See*, *e.g.*, *Woodward v. United States*, 905 F.3d 40, 43 (1st Cir. 2018) (petitioner "adequately explained his failure to seek earlier relief" by bringing "petition approximately six months after the Supreme Court decided" relevant case); *Peter*, 310 F.3d at 711 (granting *coram nobis* where petitioner challenged conviction a year after intervening

decision); *Marcello*, 876 F.2d at 1154 (granting relief where defendant sought *coram nobis*

"promptly after" intervening decision); *Travers*, 514 F.2d at 1172 (similar).

## III.    MR. JOHNSON'S CONVICTION CONTINUES TO CAUSE HIM CONCRETE HARM

The third *coram nobis* factor is met because Mr. Johnson continues to suffer concrete

harm beyond the "mere 'desire to be rid of the stigma' of a conviction." *Fleming v. United

States*, 146 F.3d 88, 90 (2d Cir. 1998) (per curiam).  For starters, Mr. Johnson is unable to work

in the foreign exchange business due to his conviction, despite his vast experience and successful

career in this field prior to the prosecution.  *See id.* at 91 (factor can be met where petitioner

"could obtain [certain] employment but for his conviction").  Among other impediments to

obtaining employment in his field, Mr. Johnson cannot renew his Financial Conduct Authority

registration and is subject to a ban by the Federal Reserve Board.  (Johnson Decl., ¶ 8).  "[T]he

loss of the right to hold [such] occupational licenses…is the type of civil disability which could

support issuance of a writ of error coram nobis."  *Howard v. United States*, 962 F.2d 651, 654

(7th Cir. 1992); *see*, *e.g.*, *Parietti v. United States*, No. 16 Cr. 373 (PAE), 2022 WL 3139623, at

*3 (S.D.N.Y. Aug. 5, 2022).  He is also unable to travel to many countries, which further

impedes his ability to work in the foreign exchange business.  Johnson Decl., ¶ 12; *see*, *e.g.*,

*United States v. Panarella*, No. 00–655, 2011 WL 3273599, at *10 (E.D. Pa. Aug. 1, 2011);

*Chima v. United States*, No. 3:17-CV-2987-D-BT, 2019 WL 2304072, at *1 (N.D. Tex. Apr. 15,

2019); *United States v. Holt*, No. 2:05-CR-20012, 2017 WL 1181509, at *3 (W.D. La. Mar. 28,

2017).  And of course, the inability to pursue his chosen profession severely hampers Mr.

Johnson's ability to make a living and support his large family.  (Johnson Decl., ¶ 9).

Mr. Johnson's ability to conduct his family's financial affairs has also been impaired due

to his conviction in other ways.  For instance, he has been unable to obtain home insurance due

to his conviction, and insurers will not issue such insurance in his wife's name as long as he

resides in their family home. (*Id.* ¶ 11). And the availability of auto insurance is limited for

people with convictions, and Mr. Johnson's auto insurance is therefore substantially more

expensive than it would be without any conviction. (*Id.*).

Additionally, Mr. Johnson's ability to pursue charitable endeavors in which he has long

engaged, such as serving local schools and coaching children playing rugby, has suffered as well.

(*Id.* ¶ 10). And the conviction prevents him from traveling to countries including the United

States, Canada, and Australia, even though he would otherwise do so, including to visit one of

his sons who plans to work in the United States. *Id.* ¶ 12; *see also* 8 U.S.C. § 1182(a)(2)(A)(i)

(aliens are inadmissible if they commit "a crime involving moral turpitude"); *Ku v. Att'y Gen.*,

912 F.3d 133, 143 (2d Cir. 2019) (wire fraud is a crime involving moral turpitude). The inability

to "reenter the United States" is yet another harm the Second Circuit has recognized as sufficient

for *coram nobis* relief. *Kovacs*, 744 F.3d at 49.

## IV.    THE MONIES MR. JOHNSON PAID TO SATISFY THE FINE AND SPECIAL ASSESSMENT SHOULD BE RETURNED TO HIM

The $300,900 that Mr. Johnson paid in financial penalties (a $300,000 fine and a $900

special assessment) also should be returned to him. The return of fines is warranted—as the

government itself often stipulates—when convictions are vacated on *coram nobis*. *See*, *e.g.*,

*Telink, Inc. v. United States*, 24 F.3d 42, 46-47 (9th Cir. 1994); *Mandel*, 862 F.2d at 1075 & n.13;

*Parietti*, 2022 WL 3139623, at *3 & n.2; *James v. United States*, No. 16-22029-CIV-

WILLIAMS, 2017 WL 11319189, at *2 (S.D. Fla. Feb. 13, 2017); *Dunn v. United States*, No.

2:02–cr–0468–MCE–CMK, 2012 WL 1455238, at *1 (E.D. Cal. Apr. 26, 2012). This makes

sense, because there is no justification for the government to keep such penalties if a defendant's

conviction has been vacated, regardless of the basis for the relief or the procedural mechanism

for it.  As the Second Circuit explained in the context of a conviction that was vacated because a

defendant had died during the pendency of his appeal:  "Once [a defendant's] conviction is

vacated, the state is as much entitled to retain the fine as if [the defendant] had been acquitted.

And in our system of criminal justice, the state is not permitted to charge the accused for the

privilege of having been prosecuted."  *United States v. Libous*, 858 F.3d 64, 67 (2d Cir. 2017).

## V.    THE GOVERNMENT SHOULD NOT BE PERMITTED TO RETRY MR. JOHNSON

In addition to "right to control," the jury was instructed on an alternative theory of wire

fraud, misappropriation, but a retrial on that theory should be foreclosed in the interests of

justice.  As explained below, the misappropriation theory fails as a matter of law.  Additionally,

the equities weigh against permitting the government to pursue any retrial.

### A.    The Misappropriation Theory Was Legally Invalid

The government argued that HSBC should not have bought pounds ahead of its

transaction with Cairn because, in so doing, HSBC supposedly misappropriated Cairn's

confidential information about its plans to conduct a large foreign exchange transaction related to

an asset sale.  The government's claim that HSBC's "trading ahead" in this manner constituted

unlawful misappropriation turned on whether HSBC owed a duty of "trust and confidence" to

Cairn—a conclusion that, in the context of this case, was foreclosed by law.  In other words, the

government's misappropriation theory should not have been decided by the jury because it was

legally invalid, just like "right to control."[6]

---

[6] The government's theory was analogous to theories used to prosecute "insider trading," where a person
steals material non-public information in breach of a fiduciary duty to the source of the information and
uses it to trade securities.  *See generally United States v. O'Hagan*, 521 U.S. 642 (1997).  Unlike the
securities markets, where rules prohibiting such conduct are long-established and buttressed by specific
regulations promulgated by the SEC, no rules or regulations prohibited the foreign exchange trading at
issue here.  Nor would applying such a rule have made sense, because large banks are constantly

To establish liability under a misappropriation theory, the government must show that the defendant had a "fiduciary duty or similar relationship of trust and confidence" with the victim. *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (en banc); *accord United States v. O'Hagan*, 521 U.S. 642, 654 (1997) ("misappropriation" entails a "violation of a fiduciary duty"). "A 'similar relationship of trust and confidence'" is "the functional equivalent of a fiduciary relationship." *Chestman*, 947 F.2d at 568. "One acts in a 'fiduciary capacity' when the business which he transacts, or the money or property which he handles, is not…for his own benefit" but for another, who "depends on…the fiduciary [] to serve his interests." *Id*. at 568-69. Fiduciary duties are "not to be lightly implied" in the criminal context. *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006). Rather, "an elastic and expedient definition of…relations of trust and confidence…has no place in the criminal law." *Chestman*, 947 F.2d at 570; *see also Percoco v. United States*, 143 S. Ct. 1130, 1138 (2023) (domination, control, and reliance test "is too vague" to establish fiduciary duty element of honest services fraud offense).

"[D]eception" is also "essential to the misappropriation theory." *O'Hagan*, 521 U.S. at 655. Where a "fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'decept[ion]'" and, therefore, "full disclosure forecloses liability under the misappropriation theory." *Id.*

The misappropriation theory did not apply to Mr. Johnson's case as a matter of law, because (1) Cairn and HSBC expressly disclaimed any fiduciary relationship, and (2) there was no deception because HSBC disclosed its intention to purchase pounds ahead of the transaction.

---

purchasing multiple currencies to fulfill the foreign exchange needs of their clients, and Cairn knew HSBC would have to accumulate billions of pounds to execute the transaction.

*1. The Law Foreclosed Any Fiduciary Or Similar Relationship*

a.      The agreements governing the transaction confirm that HSBC was "not acting as a fiduciary for or as an adviser" to Cairn.  (A-373).  First, the Mandate Letter repeatedly disclaimed any "fiduciary" or "similar relationship of trust and confidence."  *Chestman*, 947 F.2d at 566.  It stated unambiguously, for example, that it did not "create[e] any form of advisory or other relationship" between HSBC and Cairn (A-310)—expressly disclaiming a hallmark of fiduciary relationships.  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1308-09 (2d Cir. 2002) ("no fiduciary duty" without "an express advisory contract" absent "transformative 'special circumstances'" such as "a client who has impaired faculties").

It further specified that HSBC was "not responsible for providing" Cairn with "advice" and that Cairn was "solely responsible for making its own independent appraisal" of the transaction.  (A-310).  As the Second Circuit has explained, "reliance" is "[a]t the heart of the fiduciary relationship," and there is no such relationship if the client does not "depend[] on…the fiduciary [] to serve his interests."  *Chestman*, 947 F.2d at 568-69; *see also Kirschner v. Bennett*, 648 F. Supp. 2d 525, 534-35 (S.D.N.Y. 2009) (Lynch, J.) (no fiduciary duty where agreement "explicitly states that every FX customer entered into each transaction 'independent' of any advice or judgment offered" by the broker).  And the Mandate Letter made clear that HSBC was not "acting on behalf of" Cairn (A-310), disclaiming the essential core of any fiduciary relationship, which is that the purported fiduciary acts not "for his own benefit, but for the benefit of another person," *Chestman*, 947 F.2d at 568; *see also*, *e.g.*, *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 (2d Cir. 1980) (no "fiduciary relationship" where alleged fiduciary "was never hired by" counterparty "to act on [counterparty's] behalf").

28

Second, the Mandate Letter expressly incorporated the ISDA, which likewise disclaimed any fiduciary relationship.  A-309; A-373; *see PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (incorporation by reference makes other document "part of [incorporating document] as if incorporated into the body of it"); 11 Williston on Contracts § 30:25 (4th ed. 2023) (when "a writing refers to another document, that other document…becomes constructively a part of the writing, and in that respect the two form a single instrument").  The ISDA explicitly provided that HSBC was "not acting as fiduciary for or as an adviser" to Cairn; that HSBC was "acting for its own account" as opposed to Cairn's; that Cairn had "made its own independent decisions to enter into th[e] Transaction…based upon its own judgment"; and that Cairn was "capable of assessing the merits of" the transaction "on its own behalf or through independent professional advice."  (A-373).  At trial, Cairn's general counsel agreed that the ISDA disclaimers meant that "HSBC is not acting as a fiduciary for Cairn Energy."  (A-88-90; *see* A-60-64 (government expert concession that the ISDA "established that the parties…do not rely on their counterparties' representations or advice")).

It is hard to fathom any more definitive way to disclaim a fiduciary relationship.  Where, as here, the parties "expressly disclaimed any sort of advisory, brokerage, or other fiduciary relationship…there is no factual issue" because any fiduciary duty is necessarily waived. *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 174 (2d Cir. 2011); *see also Cooper v. Parsky*, 140 F.3d 433, 440-41 (2d Cir. 1998) (agreement that is "clear" that parties "were not…fiduciaries" is legally dispositive).  Consequently, as a matter of law, HSBC and Cairn were not fiduciaries.  *See*, *e.g.*, *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 808 (5th Cir. 2017) (enforcing "agreement [that] itself disclaims a fiduciary relationship"); *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1022 (8th Cir. 2001)

(where parties "expressly disclaimed any [fiduciary or agency] relationship in their contract," that "precludes [] claim for breach of fiduciary duties"); *Kirschner*, 648 F. Supp. 2d at 534-35 (no "fiduciary relationship" where broker "entrusted" with "the execution of foreign currency transactions upon receiving explicit customer instructions" and agreement disclaimed "fiduciary" or "advisor" relationship).

b.     Independent of what the contracts say, the parties were sophisticated, multibillion-dollar enterprises transacting at arm's length, which also forecloses any fiduciary relationship as a matter of law.  *See*, *e.g.*, *Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 224 (2d Cir. 2018) ("arms' length dealings do not admit an inference" that parties were "fiduciaries"); *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (sophisticated counterparties dealing "at arms length in a commercial transaction" have no "fiduciary relationship" "absent extraordinary circumstances"); *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (there is "not a fiduciary" relationship where the parties "ha[ve] an arms-length contractual relationship").

In *Allen*, plaintiffs were a putative class including trustees of sophisticated employee benefit plans who alleged that defendant banks (including HSBC) acted as the plans' "fiduciaries" when executing fix transactions for the plans.  895 F.3d at 217-20.  Like the government here, they claimed that the banks breached their fiduciary duties by "amass[ing] large proprietary currency positions…just before or during the fixing window" in order to manipulate the fixing rate.  *Id*. at 220.  The district court dismissed the complaint because the banks were not "performing a fiduciary function when they executed [the] FX transactions."  *Id*. at 223.  The Second Circuit agreed.  A fiduciary must "control…the disposition of [its clients'] assets," and the banks in *Allen* did not exercise the requisite "unilateral[]" "control."  *Id*. at 224.

30

The same is true here.  Cairn, like the *Allen* plaintiffs, determined whether to transact and dictated the pertinent details.  HSBC never even had possession of Cairn's money, and instead traded its own pounds for Cairn's dollars at the 3pm exchange rate.  (A-203-205).  Lacking control over Cairn's assets, HSBC was simply an arm's-length counterparty, not a "fiduciary."

    2.  *The Full Disclosure Of The Trading Methodology Bars Misappropriation As A Matter Of Law*

Mr. Johnson's disclosure to Cairn that HSBC would profit by trading ahead of the fix provides an additional, independent reason the misappropriation theory does not apply here.  "[F]ull disclosure forecloses liability under the misappropriation theory."  *O'Hagan*, 521 U.S. at 655.  Mr. Johnson was explicit that HSBC would trade ahead because otherwise it would earn no fee and "[its] business" "clearly" was "to make…money."  (A-387).

Cairn knew that HSBC would trade in advance of the transaction, that it would seek to "make money on the trade" by "beat[ing] the fix," and that, given the size of the transaction, HSBC's trading would "pressure the fixing."  (A-397; A-136).  Cairn even asked Mr. Johnson whether it could "share some [of the] upside" if HSBC "beat the fix," but Mr. Johnson declined.  (A-389-90).  It could not have been any clearer to Cairn that HSBC—which was not otherwise collecting a fee for this transaction—would seek to earn a profit by trading ahead of the fix.[7]

**B.    The Equities Weigh Against Permitting Any Retrial**

Mr. Johnson was deprived of having the validity of the government's misappropriation theory, which he vigorously challenged, reviewed on direct appeal.  Indeed, it seems likely the Second Circuit declined to address that claim because it recognized that misappropriation was a

---

[7] The government argued at trial that a duty was established by two earlier documents, but they were superseded by the Mandate Letter and ISDA.  For these and other reasons (*see* CA2 Dkt.60), the government's attempts to conjure up a duty of trust and confidence all fail as a matter of law.

dubious theory whose applicability to Mr. Johnson's case presented—at the very least—a difficult question.[8]  But because the court ducked that issue and then affirmed solely based upon the invalid right-to-control theory, Mr. Johnson was forced to serve a significant sentence he might have avoided had the Second Circuit addressed all of his appellate claims.

Permitting a retrial is not only barred by law, but also would be particularly unjust under the circumstances.  Mr. Johnson has been punished harshly for conduct that was not criminal.[9]  He will of course never be able to fully recover his reputation,[10] but this Court should exercise its power to fully expunge his conviction.

**CONCLUSION**

A person's liberty should not turn on an accident of timing, but here that is exactly what has happened to Mr. Johnson.  If *Ciminelli* had been decided while Mr. Johnson's direct appeal was pending, he would have been entitled—at a minimum—to a new trial, because the jury was permitted to convict him, and may well have convicted him, based upon a legally invalid theory of wire fraud.  And if *Ciminelli* had been decided while Mr. Johnson's direct appeal was pending, the Second Circuit would have had to address his claim that the alternative

---

[8] During oral argument on bail pending appeal, the only substantive questions the Second Circuit posed related to the misappropriation theory.  One member of the bail panel noted that the District Court itself had called the misappropriation claim "a particularly knotty issue."  *See* Oral Argument at 3:00, *United States v. Johnson* (2d Cir.) (No. 18-1503), https:/ /www.ca2.uscourts.gov/decisions/isysquery/a5903b2e-3dbd-4db4-b938-9188f69a3718/20/doc/18-1503.mp3.  Although the order granting bail did not specify what question or questions the bail panel found "substantial" (CA2 Dkt.46), it is reasonable to infer that the panel considered misappropriation to be one such question.

[9] And this is not the only reason Mr. Johnson's conviction was fundamentally unfair.  As discussed *supra* at 10 n.5, the jury instructions about Mr. Johnson's testimony were constitutionally infirm under *Solano* and deprived him of a fair trial, but the Second Circuit denied review of that claim too.

[10] As former Labor Secretary Raymond Donovan famously said after his acquittal on federal criminal charges:  "Which office do I go to to get my reputation back?"  Selwyn Raab, *Donovan Cleared of Fraud Charges by Jury in Bronx*, N.Y. Times, May 26, 1987.

misappropriation theory also failed as a matter of longstanding black letter law.  That should have required a reversal with instructions to enter a judgment of acquittal.

Instead, the Second Circuit affirmed Mr. Johnson's conviction under a theory that the Supreme Court subsequently pronounced cannot sustain a wire fraud charge.  Thus, Mr. Johnson served a significant term of incarceration and suffered onerous financial penalties for conduct that is not criminal, while his co-defendant, who engaged in the same innocent conduct and was previously charged with the same offenses, never faced trial and never will.

Fundamental fairness demands that similarly situated defendants be treated similarly: "The integrity and legitimacy of our criminal justice system depend upon consistency, predictability, and evenhandedness."  *Hughes v. United States*, 138 S. Ct. 1765, 1779 (2018) (Sotomayor, J., concurring).  It would be manifestly unjust to let Mr. Johnson's conviction stand.

For the foregoing reasons, a writ of error *coram nobis* should be granted, the judgment of conviction against Mr. Johnson should be vacated, and the monies he paid as financial penalties should be returned to him.


Dated: July 25, 2023

 /s/ Alexandra A.E. Shapiro

Alexandra A.E. Shapiro
C. Eric Hintz
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
cehintz@shapiroarato.com

*Counsel for Petitioner Mark Johnson*