UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARK JOHNSON,

                                    Petitioner,

            -against-

UNITED STATES OF AMERICA,

                                    Respondent.

**MEMORANDUM & ORDER**

**23-CV-5600 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Petitioner Mark Johnson was convicted in October 2017 of one count of wire fraud conspiracy and eight counts of wire fraud for actions he undertook as the head of HSBC's Global Foreign Exchange Business. He has since served his sentence and term of supervised release and has paid his fine. He now seeks to vacate his conviction by bringing a petition for a writ of error *coram nobis* following the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which invalidated the right-to-control theory of wire fraud, a theory which was included in Mr. Johnson's jury charge.

For the reasons discussed herein, because a review of the record demonstrates that justice does not require vacatur of Mr. Johnson's conviction, his Petition is DENIED.

I.    **BACKGROUND**

      A.  **Factual Background**

In 2016, Mark Johnson was charged with wire fraud and wire fraud conspiracy for activities he undertook in 2011, while the London-based head of HSBC Bank plc's ("HSBC" or the "Bank") Global Foreign Exchange Business. (Mot. For Writ of *Coram*

1

*Nobis* ("Petition"), *Mark Johnson v. United States of America*, No. 23-CV-5600 ("Civ. Dkt.")[1], Civ. Dkt. 1); *see also* Indictment, *United States v. Mark Johnson*, No. 16-CR-457 (NGG) ("Cr. Dkt."), Cr. Dkt. 182; Final Jury Charge (Cr. Dkt. 162) at 33-37.) (Cr. Dkt. 9).)

In this role, Mr. Johnson acted with others at HSBC to pitch and service the foreign exchange ("FX") needs of Cairn Energy ("Cairn" or the "Client"), a large European energy company. Cairn sought a bank to execute FX transactions following a recent sale of its stake in Cairn India, which required the conversion of approximately 4 billion US Dollars ("USD") to GB Pounds Sterling ("GBP"). (*See* Cairn Request for Proposal dated October 4, 2011 ("Cairn RFP") (Government Exhibit ("GX") 103B) at 1; *see also* A-267.[2])

Cairn required banks, before receiving the request for proposals ("RFP"), to enter into a confidentiality agreement which required HSBC not to disclose any confidential information received from Cairn and only to use the confidential information for the reasons for which the information was provided. (*See generally* Non-Disclosure Agreement (GX 102B); *see also* A-264.) The Agreement stated that it would "remain in full force and effect" for two years. (Non-Disclosure Agreement at 2.)

---

[1] The court cites to Mr. Johnson's civil docket, No. 23-CV-5600, which includes briefing relating to his Petition, with "Civ. Dkt." The court cites to Mr. Johnson's criminal docket, No. 16-CR-457, which includes filings relating to his criminal trial and conviction with "Cr. Dkt."

[2] "A-" refers to the page numbers provided in the Second Circuit Appendix. *See* Appendix, *United States v. Johnson*, No. 18-1503 (2d Cir. Aug. 30, 2018) Dkts. 57-59. The court generally cites to the criminal docket and trial exhibits. However, when first citing to the exhibits, the court references the first page on which the exhibits are included in the Second Circuit Appendix, which is cited throughout Johnson's briefing. (*See generally* Petition; Reply.)

While pitching its services, HSBC, including Mr. Johnson, made certain representations about how it would engage in FX transactions. *See infra.* Most relevant are representations about how the Bank would engage in a "fix" transaction where the Bank agrees to engage in a currency transaction at what is essentially a proxy for the prevailing market rate (the "fix rate") at some future designated time (the "fix time"). (Mandate Letter (GX 115B); *see also* A-309.)[3] In these transactions, all things equal, the Bank's profit depends on the difference between the price at which the Bank buys the target currency and the price at which the Bank sells the target currency to the Client at the fix time. (*See* Sept. 25, 2017 Trial Tr., (Cr. Dkt. 270) at 86:5-11, 105:8-108:24 (testimony of Dr. David DeRosa, an expert in the field of foreign exchange transactions, reviewing the mechanics of a fix transaction).) The Client, on the other hand, prefers a lower "fix rate," because a lower rate means it receives more of the target currency using the same amount of base currency.

In this case, Cairn was seeking to convert USD to GBP. They would thus desire a lower GBP/USD rate because a lower rate means Cairn would receive more GBP per unit of USD. So if the rate increased ten minutes before the fix time, Cairn would receive fewer GBP for the same amount of USD than if the fix time was ten minutes earlier. The Bank, however, stood to profit if the market GBP/USD exchange rate (the "price" of 1 GBP in USD) at the fix time was higher than the GBP/USD rate at which the Bank accumulated USD.[4]

---

[3] Under the terms of the Mandate Letter, HSBC committed to "[t]rade with Cairn at a Spot execution price equivalent to one (or several) publicly available fixing(s), the price would be no higher than the mid fixing(s) level, provided HSBC is given c. 2 hours notice prior to each fixing." (Mandate Letter at 1.)

[4] The "price" at the relevant fix time was 1.57185 GBP/USD, and HSBC offered to conclude the transaction at a rate 0.00025 better for Cairn at

3

Because of the misaligned incentives in FX transactions, Cairn sought assurances that, if chosen to engage in the relevant transaction, HSBC would act in Cairn's interest by limiting the risk of a spike in the exchange rate. Cairn's RFP stated that the "key criterion for the selection of banks for the role of Execution Bank will be the ability to deliver a seamless process for the currency exchange within a defined timetable whilst providing Cairn with the best execution strategy and pricing." (Cairn RFP at 1.) And HSBC and Johnson made specific representations about how they would provide this. In a slide deck used to pitch Cairn, HSBC stated that:

> Time to execute is essentially a choice for the company, as HSBC is able to provide one quote for the full amount or even **drip feed the market in utmost confidential nature so as to ensure there are no sudden FX moves against the company.** (HSBC Sales Pitch (GX 104B) at 5 (emphasis added); *see also* A-272).

Mr. Johnson also spoke with Francois Jarrosson, a partner at the investment bank Rothschild who was working on behalf of Cairn, where he described to Jarrosson how HSBC would effectuate the transaction. (*See generally* Transcript of October 13, 2011 Phone Call (GX 193(T)) ("Oct. 13, 2011 Jarrosson Call"); *see also* A-376.) When discussing the Bank's approach to a fixed transaction, Mr. Johnson stated that the Bank would accumulate the desired currency "quietly" and described the process for accumulating the funds for a fix transaction as gradually building up

---

1.5716 GBP/USD. (Email From Hamza Azeem dated December 7, 2011 (GX 153); *see also* A-325.) This exchange rate allowed Cairn to convert USD 3,536,100,000 into the GBP 2,250,000,000 Cairn requested (GBP 2,250,000,000 times 1.5716 GBP/USD = USD 3,536,100,000). (*Id.*) If the GBP/USD rate was 0.0010 lower, Cairn would save USD 2,250,000 (GBP 2,250,000,000 times 0.0010 GBP/USD = USD 2,250,000).

their position while trying to "control the market so it doesn't look too noisy." (*Id.* at 12.)

Johnson also stated that the Bank has "absolutely no control over where the price is" but that accumulating funds over a longer period of time would allow the Bank to avoid "noise," or price volatility, around the fix time. (*Id.* at 12-13.) And Johnson drew a distinction between HSBC's approach and other banks. (*Id.* at 14.) He stated that the pricing that other banks offer indicates that they "ramp the fix" (or increase the fix rate to the benefit of the Bank) which undermines the whole point of this type of transaction which is to offer price clarity and transparency by providing the customer the average rate around the fix time. (*Id.* at 14-15.)

Cairn ultimately chose HSBC. They also decided to use the fixing transaction rather than alternative trading strategies. The decision to do so was in part due to the transparency of this strategy and their understanding that HSBC had a "'best execution' duty not to influence the market adversely with the Company's trade." (Cairn Board Meeting Minutes (Defense Exhibit ("DX") 309) at 2; *see also* A-407; Rothschild Information Memorandum (GX 113B) at 4; A-308.)

After being chosen, the Bank committed to the transaction in a "Mandate Letter," which noted that the transaction is subject to the terms of the International Swap Dealers Association Master Agreement ("ISDA")[5], entered into between Cairn and HSBC the prior year, in June 2010. (Mandate Letter at 1; *see also* ISDA (GX

---

[5] An ISDA Master Agreement is a standard form agreement published by the International Swap Dealers Association that provides certain legal and credit protections for parties in over-the-counter transactions. *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 521 n.8 (S.D.N.Y. 2018); *see also In re Lehman Bros. Holdings Inc.*, 970 F.3d 91, 96 n.3 (2d Cir. 2020).

191); *see also* A-351.) The ISDA included several provisions relating to the relationship between Cairn and HSBC, including: a "non-reliance" provision in which the parties state that they are acting for their own account, a provision in which HSBC disclaimed that it was acting as a fiduciary of the other party, and a provision in which HSBC disclaimed an agency relationship. (*Id.* at 23.) The ISDA also noted that the relationship for a given transaction may be modified by a "written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction." (*Id.*)

On December 7, 2011, a little over a month after Cairn chose HSBC for its FX needs, Cairn requested that HSBC exchange USD into GBP 2.25 billion (the equivalent of approximately USD 3.5 billion) using a fix transaction with the fix rate to be set that day at 3:00 p.m. *See United States v. Johnson*, 945 F.3d 606, 610 (2d Cir. 2019).[6] Stuart Scott, who worked with Mr. Johnson, passed this information to Frank Cahill, an HSBC trader who would execute the transaction. (Oct. 4, 2017 Trial Tr. (Cr. Dkt. 265-2) at 987:17-988:25, 1001:2-1003:21.) Cahill then accumulated Sterling in a manner that he testified intentionally caused the GBP/USD fix rate to increase ahead of the fix time, which led to greater profits for HSBC at the expense of Cairn. (*Id.* at 994:15-997:17, 1127:24-1128:21.) If trying to keep the price low, he would have employed a different trading strategy. (*Id.* at 998:6-998:22).

---

[6] The initial request was for a smaller amount but was then increased to GBP 2.25 billion. (Oct. 6, 2017 Trial Tr. (Dkt. 265-4) at 1424:7-1425:25; *see also* Oct. 12, 2017 Trial Tr. (Dkt. 275) 2044:2-20; GX 163.) Upon learning that the amount would increase, Johnson said "[n]o, you're kidding" and "fucking Christmas" and did not express concern about the potential for a price increase given the larger order size. (Oct. 6, 2017 Trial Tr. at 1425:16-25; Oct. 17 Tr. (Dkt. 277) at 2285:1-17; *see also* GX 163.)

A recorded phone call between Johnson and Scott that began at 2:54 p.m., minutes prior to the fix time, indicates that Mr. Johnson was aware that the trader was increasing the price. (*See* First Dec. 7, 2011 Phone Call Tr. (GX 167(T)) ("Jarrosson / Scott Phone Call") at 1; *see also* A-335.) Johnson and Stuart discussed the increase in the exchange rate and Johnson stated that the trader engaged in the transaction should not try to "ramp" the fix above a certain level to avoid raising concerns with Cairn. (*Id.*) Specifically, Johnson stated that the trader should not ramp the fix above 1.5730 GBP/USD, because the client would "squeal" if the rate was 100 "pips"[7] higher than the rate that morning when Cairn requested the transaction, which is what the Client would have received in a "full risk transfer" transaction, an alternative to the fix transaction. (*Id.; see also* Mandate Letter (describing the "full risk transfer" method)).[8] Cahill testified that, apart from the direction not to ramp the price above the level noted by Johnson, he did not have any discussions in which he was told he should not increase the price, which he would otherwise do to increase profits for the Bank. (Oct. 4, 2017 Trial Tr. at 993:2-7, 999:10-1003:21.)

In a call just fourteen minutes after the fix time, Scott falsely stated to Cairn's adviser, Francois Jarrosson, that the increase was a result of FX activities by the Russian Central Bank. (*See* Second Dec. 7, 2011 Phone Call Tr. (GX 168(T) ("Post-Transaction Jarrosson Call") at 1-3; *see also* A-338.) Johnson supported

---

[7] A pip in this context is one one-hundredth of a penny; a movement of 100 pips in a GBP 2 billion trade would be equal to $20 million. (Sept. 25, 2017 Trial Tr., at 111:10-112:8.)

[8] Under the full risk transaction, HSBC committed to "[t]rade with Cairn at a Spot execution price of prevailing screen rate (to be independently benchmarked and agreed with Rothschild) plus, at most, 100pips for a full risk transfer execution." (Mandate Letter at 1.)

Scott's lie, stating that the Russian Central Bank was "always sell-ing dollars." (Post-Transaction Jarrosson Call at 3.)

HSBC ultimately profited about $7 million on the transaction with Cairn.[9] *Johnson,* 945 F.3d at 611. A significant portion of the profit was attributed to Johnson's trading book. (Oct. 5, 2017 Trial Tr. at 1190:15-25 (Cr. Dkt. 265-3); *see also* Government's Opposition to Petition ("Opp.") (Civ. Dkt. 5) at 2 n.2.)

### B.  Procedural Background

Mr. Johnson was indicted in August 2016 on nine counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349.[10] (*See gener-ally* Indictment.) In describing Johnson's wire fraud charge, the Indictment stated that he "did knowingly and intentionally de-vise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company by means of materially false and fraudulent pretenses, representa-tions and promises." (*Id.* ¶¶ 37, 39.)

Mr. Johnson's jury instructions, when describing the elements of wire fraud, stated that the government must prove, *inter alia,*

---

[9] The defense's expert calculated that HSBC made between $6.7 million and $7.5 million on the deal. (Oct. 10, 2017 Trial Tr. at 1636:22-25 (Cr. Dkt. 273).)

[10] Johnson's colleague Stuart Scott was named as a co-defendant. (*See* In-dictment.) However, he never appeared because, in July 2018, the U.K. High Court of Justice found that he was not extraditable. (Government Mot. to Dismiss as to Stuart Scott (Cr. Dkt. 315) at 2.) The Government moved to dismiss Mr. Scott in June 2023, after concluding that efforts to secure his appearance are futile and that the small probability of securing his appearance did not justify keeping the matter on the court's docket. (*Id.*) In so concluding, the Government's motion noted that *Ciminelli* in-validated the right-to-control theory, one of the two theories with which it planned to proceed against Scott. (*Id.* at 3 n.1.) The court granted the government's motion on June 27, 2023. (Cr. Dkt. 316.)

that the scheme targeted "money or property." (Final Jury Instructions (Cr. Dkt. 162) at 30, 33.) The instructions then noted that the Government put forward two theories that pertain to money or property, the right-to-control theory and the misappropriation theory, and that, to convict Johnson, the government had to prove *either* of these theories beyond a reasonable doubt. (*Id.* at 33-37.)[11] Based on these instructions, the jury convicted Johnson of eight of the wire fraud counts and his sole count of wire fraud conspiracy. (Jury Verdict (Cr. Dkt. 182); Judgment (Cr. Dkt. 239).) The jury did not indicate on which theory it relied upon. (*See* Jury Verdict.)

The Second Circuit Court of Appeals affirmed Mr. Johnson's conviction on the right-to-control theory, concluding that "the evidence was sufficient to convict Johnson of wire fraud and conspiracy to commit wire fraud for depriving [Cairn] of the 'right to control' its assets." *See Johnson*, 945 F.3d at 612.[12] In doing so, the Second Circuit held that Johnson made "at least two" material misrepresentations "to Cairn about how HSBC would trade ahead of the fix and the price would be determined." *Id.* at 614-15. The first was Johnson's representation on his call with Jarrosson that he would not "ramp the fix." *Id.* at 614. The Circuit found that, based on the trial evidence, Johnson misrepresented the process by which HSBC would engage in the fix transaction because he knew how important the execution process was to Cairn and, contrary to his representations, he directed the HSBC trader to "ramp the fix to a rate just below 1.5730." *Id.* The second misrepresentation was that the Russian Central Bank caused the market movement before the fix time, a story that Johnson

---

[11] The Indictment did not reference the "right-to-control" theory, but it did reference the misappropriation theory's elements, reviewed *infra*, noting that as part of the scheme, Johnson breached "HSBC's duty of trust and confidence to the Victim Company." (Indictment ¶ 10.)

[12] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

supported despite knowing it was untrue. *Id.* at 614-15. Although this statement was made after the fix time, it was found to be material because a jury could have found that it influenced "Cairn's decision not to pursue various courses of action immediately after the fact." *Id.* at 615. The Second Circuit did "not consider Johnson's arguments with respect to the misappropriation theory" because it affirmed based on the right-to-control theory. *Id.* at 612.

Following his conviction, this court sentenced Johnson to twenty-four months followed by three years of supervised release and imposed a $300,000 fine. (Judgment at 2-3, 7-8.) Johnson has since served his sentence and paid his fine. (Petition at 12; *see also* Satisfaction of Judgment (Cr. Dkt. 305).)

On July 25, 2023, Mr. Johnson filed the present *coram nobis* Petition, requesting that this court vacate his conviction after the Supreme Court 2023 invalidated the right-to-control theory in *Ciminelli*. (*See generally* Petition). Before reviewing Johnson's Petition, the court finds it useful to first review the right-to-control theory that was invalidated by *Ciminelli*.

### C. Legal Background: The Right-To-Control Theory of Wire Fraud and *Ciminelli*

It is a federal crime to devise or intend to devise "any scheme or artifice to defraud" by means of the wires. *See* 18 U.S.C. § 1343. To sustain a wire fraud conviction, the Government must establish the defendant (1) had an intent to defraud, (2) engaged in a scheme or artifice to defraud involving material misrepresentations, meaning misrepresentations that tend to influence, or are capable of influencing, the decision of the decision-making body to which they were addressed, and (3) used the interstate or international mails or wires to further that scheme. *United States v. Caltabiano*, 871 F.3d 210, 218 (2d Cir. 2017). (*See also* Final Jury Instructions at 30.)

The Supreme Court has long held that "to defraud" refers to "wronging one in his property rights." *Cleveland v. United States*, 531 U.S. 12, 19 (2000); *McNally v. United States*, 483 U.S. 350, 358 (1987). Prior to the Supreme Court's decision in *Ciminelli*, this Circuit considered the "right to control" a property right. *See United States v. Wallach*, 935 F.2d 445, 462-463 (2d Cir. 1991). This property right encompassed the right to control "potentially valuable economic information necessary to make discretionary economic decisions." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023); *see also Wallach*, 935 F.2d at 462-463. Examples of convictions under the right-to-control theory included when the scheme "affected the victim's economic calculus or the benefits and burdens of the agreement, pertained to the quality of services bargained for, or exposed the victim to unexpected economic risk." *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021), *rev'd and remanded sub nom. Ciminelli*, 598 U.S. 306.

In 2023, the Supreme Court roundly rejected the right-to-control theory. *Ciminelli*, 598 U.S. at 309. The Court held that because "the wire fraud statute reaches only traditional property interests" the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id. at 316*. The Court noted a particular concern with the breadth of the right-to-control theory, noting a concern that it treats "mere information as the protected interest" and "criminalizes traditionally civil matters and federalizes traditionally state matters." *Id.* at 315-16. In *Ciminelli*, the defendant's indictment and conviction were based solely on the right-to-control theory. *Id.* at 316.[13]

---

[13] *Ciminelli* and *Percoco v. United States*, 598 U.S. 319 (2023), decided the same day, have led to the vacatur of at least one conviction in this district. *See United States v. Full Play Grp., S.A.*, No. 15-CR-25253 (PKC), 2023 WL 5672268, at *15, *19-26 (E.D.N.Y. Sept. 1, 2023) (finding that after Percoco and Ciminelli, the wire fraud statute, Section 1346, does not extend to the "foreign commercial bribery schemes" charged against the defendants.).

The court now turns to the standard for reviewing Mr. Johnson's Petition.

## II. LEGAL STANDARD

"The writ of error *coram nobis* is an extraordinary remedy that issues only in extreme cases, and typically is available only when habeas relief is unwarranted because the petitioner is no longer in custody." *United States v. Rutigliano*, 887 F.3d 98, 108 (2d Cir. 2018). The burden is on the defendant to show that relief is warranted. *Id.*

To receive *coram nobis* relief, a petitioner must demonstrate that "1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

In considering whether circumstances compel granting of the writ to achieve justice, "a new rule of substantive criminal law is presumptively retroactive because a defendant may have been punished for conduct that simply is not illegal." *United States v. Mandanici*, 205 F.3d 519, 525 (2d Cir. 2000). This includes substantive changes in the controlling interpretation of criminal statutes. *United States v. Reguer*, 901 F. Supp. 515, 520 (E.D.N.Y. 1995) (citing *Davis v. United States*, 417 U.S. 333 (1974)). The Supreme Court invalidating the right-to-control theory in *Ciminelli* may therefore serve as a basis for *coram nobis* relief for defendants convicted under this theory.

However, when the jury was presented with multiple theories for criminal liability, only one of which was subsequently invalidated, the court applies a harmless error analysis. *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). This analysis considers "whether the

flaw in the instructions had substantial and injurious effect or in-
fluence in determining the jury's verdict." *Hedgpeth*, 555 U.S. at
58 (citing *Brecht*, 507 U.S. at 623). This "substantial influence"
standard is met if there is "grave doubt" that the error affected
the jury's verdict; if so, "the conviction cannot stand." *O'Neal v.
McAninch*, 513 U.S. 432, 435, 437-38 (1995). "A judge is in
'grave doubt' when 'the matter is so evenly balanced that the
judge feels himself in virtual equipoise as to the harmlessness of
the error.'" *Peck v. United States*, 106 F.3d 450, 454 (2d Cir.
1997) (quoting *O'Neal*, 513 U.S. at 435).

## III.   DISCUSSION

The determinative question for Johnson is whether he can meet
the first *coram nobis* factor, that justice compels granting the
writ.[14]

### A.   Circumstances Compelling Action

Mr. Johnson was convicted of one count of wire fraud conspiracy
and eight counts of wire fraud. The jury instructions stated that
either the misappropriation theory or the right-to-control theory
would be sufficient to convict, and it is unclear upon which the-
ory the jury relied when finding Johnson guilty. (Final Jury
Charge 33-37; Jury Verdict.) The question as to the first *coram*

---

[14] As noted, *coram nobis* requires showing compelling circumstances to jus-
tify action, sound reasons for delay, and continuing legal harm. As to the
second factor, Johnson brought this Petition in July 2023, just two months
after *Ciminelli* which formed the basis of his Petition. Johnson is thus able
to justify the delay in bringing this Petition, which the Government does
not contest. (*See generally* Opp.) As to the third, the ongoing harms cited
by Petitioner, (*see* Opp. at 24-25; Ex. C to Petition (Civ. Dkt. 1-5)), in par-
ticular his restrictions on travel and his career, extend beyond a "mere
desire to be rid of the stigma of a conviction." *Fleming v. United States*, 146
F.3d 88, 90 (2d Cir. 1998). They are thus sufficient to demonstrate that
Johnson continues to suffer consequences that resulted from his convic-
tion.

*nobis* factor is therefore whether there is grave doubt that including the invalid right-to-control theory affected the verdict's outcome. If there is not grave doubt that the jury would have convicted Johnson under the misappropriation theory based on a review of the trial record, the error is harmless and the first *coram nobis* factor is not met.[15]

In considering the misappropriation theory, the court first addresses Petitioner's argument that the theory is invalid outside of the securities context. (Petition at 26 n.6.) The court then reviews Johnson's case under the elements of the misappropriation theory. These elements are that: (1) "the Defendant entered into a

---

[15] The government argues that the court should uphold the conviction under both the misappropriation theory and the "traditional" theory of fraud. (Opp. at 12, 22-24.) The Second Circuit's recent analysis in *United States v. Tuzman* is helpful in considering whether this theory should be considered in the court's harmless error analysis. No. 21-2229, 2024 WL 1173044 (2d Cir. Mar. 19, 2024). In *Tuzman,* the Second Circuit upheld a wire fraud conviction on direct review by applying the traditional theory of fraud when the jury charge included instructions similar to Johnson's. *Id.* at *3. In both *Tuzman* and here, the instructions note that the scheme must have deprived the victim of money or property and expands the definition of property to include the right to control assets (i.e. the right to control money or property or assets). The Second Circuit found that although the definition of money or property included the right to control assets, the court still "read the jury the traditional property theory," *Tuzman,* 2024 WL 1173044 at *3; *see also Tuzman* Jury Charge, Trial Tr. at 7171:22-7172:10, *United States v. Tuzman,* No. 15-CR-536 (PG) (S.D.N.Y. December 22, 2017), Dkt. 707. However, the traditional fraud theory is inappropriate here because the jury in Johnson's case was also instructed that to find Petitioner guilty under the right-to-control theory, it must find that the scheme was meant to deprive Cairn of money or property and that the "the **property at issue is the alleged victim's right to control its assets,** which can be harmed when the alleged victim is deprived of potentially economically valuable information that would be valuable in deciding how to use those assets." (Final Jury Charge at 36 (emphasis added).) Because the court directed the jury to focus solely on the right to control assets if convicting under the right-to-control theory, the traditional fraud theory was not properly before the jury and will not be considered.

relationship of trust and confidence with Cairn"; (2) "Cairn provided the Defendant with confidential information in the course of such a relationship"; (3) "the defendant . . . secretly used that information for his own benefit, under circumstances where that use could or did result in a tangible harm to Cairn"; and (4) the defendant acted "with knowledge and fraudulent intent." (Final Jury Charge at 35.)

### 1.   Whether the Misappropriation Theory is Valid

In a footnote, Petitioner suggests that the misappropriation theory is invalid because it is limited to the securities context and that applying it to foreign exchange trading would not have "made sense." (Petition at 26 n.6 (citing *United States v. O'Hagan*, 521 U.S. 642 (1997)).) Johnson's trial counsel raised a similar argument when arguing that the court should not include the misappropriation theory in the jury charge. (Defense Letter dated October 15, 2017 (CR Dkt. 153) at 7-20.)[16] But, as this court found prior to including this theory it in the jury charge, although this theory is generally brought in the securities context, the "Supreme Court has held that wire fraud charges may also proceed on a misappropriation theory." (Memorandum and Order dated September 1, 2017 (Dkt. 101) at 10 (citing *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987)); *see also* Memorandum and Order dated September 21, 2017 (Dkt. 126) at 4-5 (discussing the misappropriation theory in the context of "both prosecutions under the wire fraud and mail fraud statutes as well as civil and criminal actions enforcing SEC Rule 10b-5, 17 C.F.R. § 240."); Charge Conference Tr. at 2246:24-2247:11 (finding that

---

[16] There is some overlap between Petitioner's argument that the misappropriation theory is invalid outside of the securities context and the argument that Johnson did not owe a duty of trust and confidence as a matter of law, which is discussed in the following section.

whether Johnson owed a duty to Cairn under the misappropriation theory was a question for the jury to decide)). *See also United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991).

Petitioner does not cite to any intervening and controlling law that would lead the court to reverse its prior determination that the theory is valid. The court thus finds that this theory is valid for the purpose of evaluating Mr. Johnson's Petition under the harmless error analysis.

Johnson also argues that it is unfair or unjust that the Circuit did not to consider the validity of the misappropriation theory directly because it upheld the conviction solely under the now-invalid right-to-control theory. (*See, e.g.,* Mot. at 12-13, 16, 21; Reply at 1-2, 7.) *See also Johnson*, 945 F.3d at 612 ("[W]e need not and do not consider Johnson's arguments with respect to the misappropriation theory."). However, the Circuit through its silence did not indicate, much less hold, that the misappropriation theory was invalid as a matter of law. And the Circuit's failure to consider this theory does not provide reason for this court to reconsider its own prior rulings.

The court thus moves onto whether there is grave doubt as to whether the jury would find that the elements of the misappropriation theory were met.

> ### 2. Misappropriation Theory Element #1: Duty of Trust and Confidence
>
> #### a. *Duty as a Matter of Law*

To meet the first element of the misappropriation theory, the jury had to find that Johnson owed Cairn a "duty of trust and confidence." (Final Jury Charge at 34.) Whether this was a matter for the jury to decide, or whether Johnson did not owe this duty as a matter of law, was thoroughly litigated by Johnson's trial counsel. (*See* Memorandum and Order dated September 1, 2017 at 8-

16

13 (discussing the misappropriation theory when ruling on John-son's fourth motion *in limine* to exclude evidence and testimony related to the non-disclosure agreement); Memorandum and Or-der dated September 21, 2017 at 4-10 (same) (citing *Carpenter v. United States*, 484 U.S. 19, 27 (1987) and *Chestman*, 947 F.2d at 568); Defense Letter dated October 15, 2017 at 7-15 (defense arguing that the misappropriation theory fails because "the evi-dence does not support . . . the existence of any 'duty of trust and confidence'"); Charge Conference Tr. at 2242:11-2247:11 (par-ties discussing the misappropriation theory).)

The court found this to be a "knotty issue" but ultimately held that it was a jury question as to whether Johnson owed Cairn a heightened duty that went beyond a straightforward counter-party duty. (Charge Conference Tr. 2242:13-14, 2246:24-2247:11; *see also* Final Jury Charge at 34-35 (including the mis-appropriation theory as a valid theory of conviction).)

Petitioner reiterates many of the arguments raised by trial coun-sel in arguing that, as a matter of law, Johnson did not owe this duty to Cairn. (*Compare* Petition at 26-31 *with* Defense Letter dated October 15, 2017 at 7-15.) But Petitioner again does not cite to any intervening and controlling cases that would lead it to reverse its decision that the question of duty was validly put be-fore the jury. Petitioner notes the concern raised in *Ciminelli* that the federal fraud statutes must be construed narrowly, (Petition at 315-16 (citing *Ciminelli*, 598 U.S. at 315-16)), but this general statement was made in the context of a concern of criminalizing "mere information," as compared to traditional property inter-ests. *Ciminelli*, 598 U.S. at 315-16. That concern is not implicated when applying the misappropriation theory which imposes "heightened responsibilities" on defendants who enter into a re-lationship of trust and confidence with the victim. (Final Jury Charge at 35.) *See also Carpenter* 484 U.S. at 25 (distinguishing the property rights under the misappropriation theory from the

property rights at issue in *McNally*.) As per Johnson's Final Jury Charge, criminal liability may only be imposed where the jury finds: that this duty exists, that the defendant had as a result of this relationship, that the defendant received information as a result of this relationship, that the defendant used this information with knowledge and fraudulent intent, and that this could or did result in "tangible harm" to the victim. (*Id.*) This stricter standard mitigates the over-criminalization concerns raised in *Ciminelli*.

Petitioner also argues that *Ciminelli* altered the law as it relates to the language in the Mandate Letter and ISDA because *Ciminelli* overruled the Second Circuit's decision in *United States v. Binday,* (*see* Reply at 16), which the Circuit cited when, in upholding Johnson's conviction, it stated that "Section 1343 applies even if the parties' contract was never breached." *Johnson*, 945 F.3d at 613 (citing *United States v. Binday*, 804 F.3d 558, 564 (2d Cir. 2015), *abrogated by Ciminelli*, 598 U.S. 306). This argument is also unavailing. First, the Second Circuit discussed *Binday* only after Johnson relied on it in part to argue essentially the same argument he raises here, that he cannot be liable for wire fraud absent a contractual breach. *Johnson*, 945 F.3d at 613 ("Relying in part on our decision in *Binday*, Johnson urges that he cannot be criminally liable for wire fraud in the absence of a contractual breach."). The Circuit then discussed and rejected Johnson's interpretation of the case. *Id.* ("[F]raudulent intent may be apparent where the false representations are directed to the quality, adequacy or price of the goods themselves . . . because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain. Similarly here, Johnson represented to Cairn that the price of the FX Transaction would be determined under particular conditions.") Second, and more significantly, *Ciminelli's* reference to *Binday* related to the harm to the property interests at issue in *Binday*, specifically, the "right to control [] assets," *Ciminelli*, 598 U.S. at 313. The Supreme Court did not discuss *Binday's* analysis of the relation between

the misrepresentations at issue, the harm, and any relevant bargains, *Binday*, 804 F.3d at 570, or otherwise invalidate Second Circuit law that a defendant may commit wire fraud even absent a breach of contract when the defendant had an intent to defraud and the contemplated harm affects the "very nature of the bargain." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). Thus, *Ciminelli* did not change the law as it relates to whether the Mandate Letter's reference to the ISDA eliminated the possibility of finding guilt under the misappropriation theory.[17]

Petitioner also cites to a 2018 Second Circuit case, *Allen v. Credit Suisse Securities (USA) LLC*, in which, according to Petitioner, the Circuit "held that a multitude of analogous fix transactions performed by HSBC did not give rise to . . . fiduciary status." (Reply at 13-14 (citing *Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 223 (2d Cir. 2018)).) However, this case involves different relationships between Johnson and Cairn than the relationships considered in *Allen*, and *Allen* was expressly limited to the ERISA context, considering the ERISA definition of fiduciary which focuses on "the exercise, as well as the possession, of authority or control over a pension plan's assets." *Allen*, 895 F.3d at 222-23. There, the Circuit concluded that "the alleged wrongdoing did not afford defendants the control over the Plans' assets necessary to make them ERISA functional fiduciaries." *Id.* at 225-26. The

---

[17] The court does not consider the Government's alternative argument that Petitioner's argument also fails because the confidentiality agreement constituted an express term that would impose affirmative obligations on HSBC for a specific transaction (i.e., the FX transactions that were the subject of the RFP process), which, according to the Government, would then impose an obligation on the parties under the terms of the ISDA. (Opp. at 19; *see also* ISDA at 23 (noting that the terms of the ISDA relating to the relationship between the parties may be altered with "a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction."))

case does not control in this wire fraud case, considering a separate duty of trust and confidence.

The court thus declines to reconsider its rejection of trial counsel's argument that Johnson did not owe a duty of trust and confidence under the misappropriation theory as a matter of law.

### b. *Harmless Error Review*

Turning to whether there is grave doubt that the jury would have found, absent the right-to control-theory, that the defendant "entered into a relationship of trust and confidence with Cairn." (*See* Final Jury Charge at 34.) *See also United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

This duty "exists only where (1) a defendant explicitly accepts that duty, or (2) where a defendant's acceptance of that duty may be implied from a pre-existing fiduciary or similar relationship of trust and confidence between that defendant and the claimed principal." (Final Jury Charge at 35.) *See also Chestman*, 947 F.2d at 571. A "duty of trust and confidence is not to be lightly implied." (Final Jury Charge at 35.) *See also United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006). "[E]ntrusting someone with confidential information does not, without more, give rise to a relationship of trust and confidence." (Final Jury Charge at 35.) *See also Chestman*, 947 F.2d at 568 (citing *Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796, 799 (2d Cir. 1980)). Important considerations in determining whether this duty is to be found are: "reliance" of the victim on the defendant, control over the victim's assets, the victim's sharing of confidential information with the defendant, and the degree of confidence and trust that the victim placed in the defendant. (Final Jury Charge at 34.) *See also Chestman*, 947 F.2d at 568-69.

The facts presented at trial support a jury's finding that Johnson owed a duty of trust and confidence to Cairn. The Government provided evidence that HSBC entered into a confidentiality

agreement that was to remain in effect for two years, where the Bank promised not to disclose the confidential information provided and to use it solely for the purposes for which it was provided. Johnson and HSBC also made specific representations about how they would engage in the relevant transaction, with Johnson explaining how the Bank would purchase the target currency in a way that avoids noise and an increase in price prior to the fix time, distinguishing how HSBC would approach the transaction with competitors that ramp up the fix rate to profit at their clients' expense. Then, once Cairn engaged HSBC for the transaction, Cairn acted in reliance on this relationship of trust and confidence to provide Johnson and HSBC information that Johnson exploited to increase the fix rate ahead of the fix time in a way that increased their profits.

The record also demonstrates the importance of trust in Cairn's decision to choose HSBC. Cairn required the Bank to maintain confidentiality as a precondition to be considered in the selection process. Cairn was also explicit that the key criteria in the selection would be best execution and pricing. While generalized agreements to offer best execution would not, on their own, create a heightened duty on HSBC or Johnson, Cairn's criteria are relevant when considering the later representations about the fix transaction and the Client's reasonable reliance on these statements. These include later representations that HSBC would "drip feed" the market to avoid moves against the company and Johnson's statements to Jarrosson about how they would engage in the fix transaction—i.e. that they would limit noise, that they cannot control the price, and that they would not act like other banks that ramp up the price. Johnson's committing to engage in the transaction in this manner while receiving Cairn's confidential information indicates that he fostered and accepted of a heightened duty of trust and confidence. This is not a case where

a duty was imposed "unilaterally" by a purported victim entrusting someone with confidential information. *Chestman*, 947 F.2d at 567. (*See also* Final Jury Charge at 35.)

Taken together, the court finds that there are not grave doubts that a jury would find that there was a relationship of trust and confidence between Johnson and Cairn.

Petitioner argues that the Mandate Letter disclaimed any heightened duty, citing to language stating that any "transaction undertaken will be governed by the terms of the ISDA in place between HSBC and Cairn." (Mandate Letter at 1.) This language, according to Johnson, precludes finding a duty under the misappropriation theory because it incorporated the ISDA's non-reliance provision and a provision stating that the parties are not acting as fiduciaries. (Petition at 29-30; *see also* ISDA at 23.) Johnson's trial counsel raised similar arguments when requesting that the court not instruct the jury on the government's misappropriation theory. (Defense Letter dated October 15, 2017 at 8-9, 13-14.) As discussed *supra*, there has not been intervening and controlling law and the court thus declines to reverse its prior determination that whether Johnson owed a duty was a question for the jury. (Jury Charge Tr. at 2246:24-2247:11; Defense Letter dated October 15, 2017 at 8-9 (reviewing the ISDA and testimony presented at trial concerning the ISDA).)

The court also finds that the standard language in the ISDA does little to support Petitioner on this grave doubt as to harmless error review. HSBC and Cairn executed the ISDA in June 2010, over a year prior to HSBC signing the confidentiality agreement as part of the RFP process and Cairn engaging HSBC for the transaction at issue. If relying on these provisions, it would require the jury to set aside: the confidentiality agreement which, by its terms, was to be in effect for two years; the RFP which specified that Cairn was interested in a transaction that guaranteed best execution for the specific currency transaction; the

representations HSBC and Johnson made about how they would engage in the transaction; and that Cairn chose HSBC based on their understanding that the Bank would have a "'best execution' duty not to influence the market adversely with the Company's trade." (Cairn Board Meeting Minutes at 2.) The court rejects that the jury would find that the line in the Mandate Letter would carry the weight that the Petitioner places on it. That there is not grave doubt on this issue is further supported by the jury finding, which it was required to do even if relying on the right-to-control theory to convict, that Johnson made "misrepresentations and omissions that deceived Cairn" and that went to the "heart of Cairn's bargain with HSBC." (Final Jury Charge at 36.) The jury would be unlikely to have found this if the ISDA language was controlling as to the relationship between Cairn and Johnson such that it made meaningless the representations that preceded and succeeded the Mandate Letter.

Petitioner also argues that a duty of trust and confidence did not exist because HSBC and Cairn are sophisticated, multibillion dollar enterprises operating at arm's length. (Petition at 30; Reply at 13.) But the record demonstrates a different relationship. Cairn sought a Bank to engage in a specific transaction in a specific manner. And Johnson and HSBC provided specific representations about how they would execute the transaction, including representations that the Bank could not control the price and would not act in a way that ramped up the price to Cairn's loss. This was not someone placing a generic market order through a broker based on the broker's representation that they provided a "fair price." It was a transaction that was preceded by specific statements by HSBC and Johnson that "would deceive an objectively reasonable investor." *United States v. Litvak*, 889 F.3d 56,

23

69 n.13 (2d Cir. 2018).[18] When considering the transaction in context, the evidence demonstrates that the parties were not mere counterparties operating at arm's length.

In sum, absent the invalid right-to-control theory, the court does not have grave doubts that the jury would find beyond a reasonable doubt that Johnson owed a duty of trust and confidence to Cairn. This element therefore favors upholding Johnson's conviction.

### 3. Misappropriation Theory Elements #2 through #4

There are also not grave doubts that a jury would find that the remaining elements are met based on the record presented at trial.

The second element requires that "Cairn provided the Defendant with confidential information in the course" of the relationship of trust and confidence. (Final Jury Charge at 35.) There is no serious dispute that this occurred. After the parties entered into a non-disclosure agreement, Cairn provided confidential information relating to the transaction at issue, including the information provided in the request to engage in the 2.25 billion

---

[18] The parties dispute the application of *Litvak* to the facts here with Petitioner arguing that it supports a finding that here there was an arms-length relationship. (*Compare* Opp. at 17-18 *with* Reply at 12.) In *Litvak*, the Circuit found that the "banter employed" by the appellant, a broker-dealer in the RMBS market, did not support that an agency relationship existed when considering the context of the broker-dealer relationship. *Litvak*, 889 F.3d at 69 n.13. However, this was because the government pointed to "no evidence" that the appellant "took steps sufficient to cause [the victim] to disregard the common knowledge of the market." *Id.* at 69. Here, by contrast, there is significant evidence in the record that Johnson's statements amount to "more than a salesman's banter" such that a reasonable investor would consider their relationship one of "special trust." *Id.* at 69 n.13.

GBP / 3.5 billion USD FX transaction at the fix time, which allowed the Bank to profit by accumulating the target currency and increasing the fix rate ahead of the fix.

The record also supports that the jury would find the third element met, that Johnson used this confidential information for his own benefit in a manner that could cause Cairn tangible harm. The evidence demonstrates that the use of the confidential information, after being passed onto HSBC's trader, led to greater profits for HSBC and greater profits attributable to Johnson at the expense of Cairn, which suffered tangible economic harm by paying more for the target currency. In addition, regardless of the theory adopted by the jury, the jury had to find beyond a reasonable doubt that the scheme to defraud resulted in "tangible economic harm" to Cairn in order to convict Johnson. (Jury Charge at 36.) The court is confident that the jury would find that the third element is met.

Finally, four calls demonstrate that a jury would find that Johnson meets the fourth element, acting with knowledge and fraudulent intent. First, in the call between Jarrosson, who was acting on behalf of Cairn, and Johnson before HSBC was chosen to engage in the transaction, Johnson described how the Bank would engage in the fix transaction if chosen by the Client. Specifically, Johnson stated that HSBC would slowly build up their position in the currency to allow Cairn to receive a better price in the transaction. He then distinguished their approach from competitors who engage in practices that increase the fix price for their own profit, which "horrified" Johnson because it undercuts "the point of doing a fix" which is to provide the client clarity as to the average price around the fix time. (Oct. 13, 2011 Jarrosson Call at 14-15.) This indicates Johnson's knowledge and awareness, when describing his approach to the transaction, that ramping up the price would benefit himself and harm Cairn.

The next three calls occurred between Johnson and his colleague, Stuart Scott, on the day of the relevant transaction. In the second call, Johnson expresses excitement that the Client wished to increase the transaction amount, exclaiming "fucking Christmas" upon hearing this news, and he does not express a concern that the larger amount could cause the exchange rate to increase. (*See* GX 163; *see also* Oct. 6, 2017 Trial Tr. at 1424:7-1425:25 (playing the phone call audio for the jury).) This indicates Johnson's knowledge that the transaction would generate a substantial profit and that Johnson was not concerned that an increase in the transaction amount to such a large size could increase the exchange rate and harm Cairn. The third call occurred at 2:54 p.m., just minutes before the 3:00 p.m. fix time. In this call, Johnson and Scott discuss the level to which Cahill, the HSBC trader, should increase the exchange rate with Johnson saying that he should not do so past 100 pips to avoid upsetting the Client. This indicates that Johnson was aware of the price increase and that he directed it to happen only up to a certain level, contradicting his prior representations to the Client. The fourth call occurred at 3:14 p.m., after the fix transaction. In this call, Scott falsely told Jarrosson, who was acting on behalf of Cairn, that the price increased because of actions undertaken by the Russian Central Bank. Johnson then supported this statement, despite his awareness that his trader was increasing the price to HSBC's benefit, by stating that the Russian Central Bank was always buying dollars. These calls, considered together, demonstrate that Johnson acted knowingly and with fraudulent intent.

In sum, the misappropriation theory was presented to the jury and remains valid. When reviewing the record, the court does not have grave doubts that, absent the invalid right-to-control theory, the jury would have found that Johnson met each of the elements required under the misappropriation theory. The court therefore finds that Johnson is unable to demonstrate that justice compels granting of the writ and DENIES his motion.

## IV. CONCLUSION

For the reasons discussed herein, Mr. Johnson is unable to demonstrate that circumstances compel granting his Petition for writ of error *coram nobis* to achieve justice. His Petition is therefore DENIED.

SO ORDERED.

Dated:     Brooklyn, New York
           April 22, 2024

                                        s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

27